UNITED STATES of America, Plaintiff-Appellant-Cross Appellee,

v.

JACKSONVILLE TERMINAL COMPANY, Defendant-Appellee-Cross Appellant,

The Brotherhood of Railroad Trainmen et al., Defendants-Appellees.

No. 30448.

United States Court of Appeals, Fifth Circuit.

Aug. 31, 1971.

Rehearing and Rehearing En Banc Denied Nov. 18, 1971.

Coleman, Circuit Judge, dissented and filed opinion.

John L. Briggs, U. S. Atty., Robert T. Moore, William B. Fenton, Attys., Dept. of Justice, Washington, D. C., Jerris Leonard, Asst. Atty. Gen., David L. Rose, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Luke G. Galant, Jacksonville, Fla., Harold L. Russell, Lloyd Sutter, E. Smythe Gambrell, William L. O'Callaghan, Jr., Atlanta, Ga., Dawson, Galant, Maddox, Boyer, Sulik & Nichols, Jacksonville, Fla., Gambrell, Russell, Killorin, Wade & Forbes, Atlanta, Ga., for Jacksonville Terminal Co.

William J. Donlon, Rosemont, Ill., for Brotherhood of Railway, Airline, and Steamship Clerks, etc.

Clarence M. Mulholland, Richard R. Lyman, Toledo, Ohio, William J. Hickey, Edward J. Hickey, Jr., Washington, D. C., William H. Adams, III, Guy O. Farmer, II, Jacksonville, Fla., for all appellees other than Jacksonville Terminal Co. and Brotherhood of Locomotive Engineers.

Donald W. Bennett, Harold A. Ross, Cleveland, Ohio, Delbridge L. Gibbs, Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, Fla., for Brotherhood of Locomotive Engineers.

Robert Hart, Cleveland, Ohio, for United Transportation Union.

Before COLEMAN, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

Once again Jacksonville Terminal Co. has accepted a challenger's gauntlet and renewed battle in this interminable litigation [1] involving management and employees. Surprising, however, and contrary to previous experience in this Court, the Terminal now occupies a single argumentative featherbed with several Union antagonists.[2] This uneasy union-management mésalliance has been necessitated by the fact that a new adversary has appeared in the field: the United States has charged the Terminal and certain Unions with violating Title VII of the Civil Rights Act of 1964. After a lengthy trial, the District Court rejected the Government's contentions, drawing the battle-lines for this appeal.[3] We affirm in part, reverse in part, and remand.

The Attorney General filed a § 707 complaint [4] against the Terminal and the above-noted labor organizations on June 24, 1968. The Government alleged that the Terminal continued to engage in specified racially discriminatory practices;[5] that the Unions have negotiated collective bargaining agreements which

1. See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 1969, 394 U. S. 369, 371 & n. 1, 89 S.Ct. 1109, 22 L.Ed. 2d 344.

2. Joined as defendants with the Terminal in this litigation are: Brotherhood of Railroad Trainmen (BRT) and Brotherhood of Locomotive Firemen and Enginemen (BLF & E) [both now affiliated with the defendant United Transportation Union (UTU)]; Railroad Yardmasters of America (RYA); Brotherhood of Railway, Airline, and Steamship Clerks, Freight Handlers, Express, and Station Employees (BRAC) and Transportation-Communication Employees (TCU) [TCU is now affiliated with BRAC]; Brotherhood of Locomotive Engineers (BLE); Brotherhood of Maintenance of Way Employees (BMWE); American Railway Supervisors Association (ARSA); Brotherhood of Railroad Signalmen (BRS); International Association of Machinists and Aerospace Workers (IAMAW); International Brotherhood of Electrical Workers (IBEW); International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (Boilermakers); Sheetmetal Workers International Association (SMW); Brotherhood of Railway Carmen of America (BRAC); International Brotherhood of Firemen, Oilers, and Helpers (IBFO); and System Federation No. 50 of the Railway Employees' Department, AFL–CIO (System Federation No. 50, or shopcrafts"—joint bargaining agent for the IAMAW, IBEW, Boilermakers, BRAC, SMW, and IBFO).

3. The findings of fact and conclusions of law made by the District Court for the Middle District of Florida are published in D.C., 316 F.Supp. 567 (1970).

4. Section 707(a) provides in pertinent part:

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him * * * (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described. 42 U.S.C.A. § 2000e–6(a).

5. According to the Government's complaint, the Terminal maintains a racially segregated, dual system of jobs and lines of progression; the employer considers only whites for jobs affording better pay and the greatest opportunities for training and advancement; blacks seeking traditionally white jobs are subjected to requirements not imposed on whites assigned to the same jobs; blacks who perform tasks essentially similar to those performed by whites are hampered by discrimination in regard to promotion, transfer, and job training; the Company requires blacks to have more work experience than whites prior to obtaining jobs essentially similar; by assigning only whites to Apprentice jobs, the Terminal excludes blacks from the jobs of Machinist, Carman, and

tend to perpetuate the effects of these practices; and that the BRAC, the BNWE, and the BRCA maintain segregated locals. The complainant sought injunctive relief barring future discrimination and correcting the effects of past discrimination.[6] At the conclusion of the trial, the District Judge delivered an oral pronouncement—subsequently buttressed and expanded by written findings of fact and conclusions of law —that the Government had failed to prove its case by a preponderance of the evidence. To clearly establish its right to injunctive relief, the District Judge later wrote, the Government was required:

(a) to prove that defendants had committed specific acts and practices of racial discrimination in employment since the effective date of the Act (July 2, 1965); (b) to prove the commission of such acts and practices independently with respect to each and every allegation contained in the complaint; (c) to prove that such specific acts and practices were intentional and such as to constitute a pattern or practice of racial discrimination as opposed to mere isolated acts; and (d) to establish all essential elements of its case by a preponderance of the evidence. * * *

316 F.Supp. at 615–616. Having imposed this burden, the District Court then concluded that the Government had not adequately borne it. The court held that the Government had neither shown specific discriminatory acts nor manifested a discriminatory pattern or practice pursued by any defendant. Conversely, the court concluded, the Terminal and the Unions had established the complete lack of discriminatory activity at the Terminal. Accordingly, the District Judge dismissed the suit with prejudice and taxed costs against the Government.

Here the Government contends, in essence, that the existence of a pattern need not be manifested by the identification of each specific thread used to weave it: i. e., the Government was not required to present a multitude of post-Act discriminatory incidents to establish its case. Moreover, the Government argues that the District Court misconstrued the evidentiary time-frame pertinent to Title VII litigation; it avers that the court's repeated references to plaintiff's failure to prove discrimination "at any material time" suggest that the District Judge has mistakenly treated pre-Act discriminatory acts or practices as without continuing consequences and therefore irremediable under Title VII, rather than as not having occurred at all. Based on these general premises, the Government challenges the District Court's findings of fact and conclusions of law. In this regard, the Government's quarrel is not so much with the empirical facts actually found by the trial judge as with his selectivity regarding *pertinent* facts which merited consideration. Because of his conservative misconceptions as to his proper factfinding role and as to the extent of the Government's burden of proof, the Government argues, the judge's perspective was too myopic. Further, he allegedly erred in his findings of "ultimate" fact (such as conclusory statements that particular acts, or series of acts, did not establish the existence of discrimination or discriminatory intent as defined in Title VII), as well as his legal conclusions derived from the factual milieu. Insofar as the Government's attack is predicated on these grounds, the "clearly erroneous" rule is not a bulwark

---

Electrician; the Company gives preference to sons of craftsmen for apprenticeships; the Terminal maintains racially segregated toilet, locker, and shower facilities.

**6.** Section 706(g) empowers the district court to enjoin any unlawful employment practice and to order appropriate affirmative action, if the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice after the Act's effective date. 42 U.S.C.A. § 2000e–5(g).

hindering appellate review. *E. g.*, Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217, 219–220; *see* United States v. Singer Manufacturing Co., 1963, 374 U. S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823.

With these thoughts in mind, we proceed to consideration of the physical environment framing this case. Initially we shall review the general employment situation at the Terminal, then examine the specific areas where the Government allegedly has uncovered discrimination. Finally we shall evaluate the parties' arguments, as well as the District Court's decision, in light of applicable statutory and decisional authority.

## I.

Owned by three major railroads,[7] Jacksonville Terminal handles passengers, freight, and United States mail; maintains Seaboard Coast Line rolling stock; and performs other tasks necessary for the safe, economical, and efficient operation of railway services. Like other facilities in the railroad industry, the Terminal has drastically reduced services and expenditures since World War II. Its annual passenger train volume has decreased from 35,000 in 1944 to 10,000 in 1969; annual operating expenses dropped from $4.9 million in 1960 to $2.3 million in 1969.

7. Seaboard Coast Line Railroad Co., Southern Railway Co., and Florida East Coast Railway Co.

8. Generally speaking, a craft is comprised of mutually related jobs in the industry. *See, e. g.*, General Order No. 27 (1918). Experience and skills acquired in one craft are not necessarily relevant to or usable in any other craft.

9. Classes are essentially subcrafts. The experience and skills acquired in one class are not necessarily related to those demanded in any other class within the same craft.

10. Two of these categories, Yardmasters and Shop Craft Supervisors, are covered by collective bargaining agreements between the Terminal and the RYA and the ARSA. Employees in these categories have been selected by the Terminal without regard for seniority. The remaining seventy-seven contract jobs span widely

Concomitant with the contracting volume of operations, as well as expanding mechanization, the Terminal has substantially reduced its work force. In 1953 the Terminal employed approximately 1200 people; in 1967 only 650 personnel remained. As of August 6, 1969, the Terminal employed approximately 532 individuals, of whom 275 were white and 257 were black. (This total does not include those on leave of absence or furloughed who did not remain active.) Some fifty of the 532 employees did not work full time; they filled vacancies or performed limited assignments.

Active employees occupied 102 separate job categories. Seventy-nine of these categories—termed "contract jobs" —are within the crafts[8] and classes[9] represented by the Unions.[10] Twenty-six employees, all white, who were either Terminal officials or unrepresented by any labor organization, occupied the remaining twenty-three categories.

Whites predominated in fifty-nine contract job categories. In August 1969, 247 of the Terminal's 275 whites occupied these positions; eight of the Terminal's 257 blacks held such jobs. Four of the eight received promotions to these positions after June 24, 1968, when the Government filed this suit.

divergent crafts and classes. Employees holding these jobs are represented by separate and autonomous labor organizations. Employment rights are governed by seven different collective bargaining agreements between the Terminal and System Federation No. 50 (representing six Unions composed of skilled craftsmen in the seven railroad metal crafts), IBFO (representing unskilled laborers who work on and around locomotives and are affiliated with System Federation No. 50), BRAC (representing skilled clerks and unskilled mail handlers and laborers), BRT (representing conductors and switchmen), BMWE (representing employees engaged in track repair, roadway machine operations, and bridge and building maintenance and repair), BRS, BLE and BLF & E (representing four engine service crafts under a single contract), and TCU (representing tower employees).

Of the other four, three were promoted to supervisory positions in the predominantly black Baggage and Mail Department beginning in 1964; and the fourth was a Switchman, a job which had been shared by blacks prior to reservation for whites. Blacks generally held eighteen of the contract jobs—all having been assigned to these categories when hired. Although job opportunities at the Terminal have not been abundant in recent years, management hired seventy-one individuals for contract jobs between October 1, 1965, and December 31, 1968; sixty where white, and eleven were black. Ostensibly the white-black assignment pattern has continued: all eleven blacks were hired as Baggage and Mail Porters. Only two whites held positions in predominantly black categories: one became a Welder Helper, and the other was a Baggage and Mail Porter.[11]

The parties stipulated regarding the number of employees, by race, who worked in each of the contract jobs, the department in which each job exists, and the Union representing employees who held each of the jobs at the Terminal.[12] Moreover, they stipulated with respect to rates of pay: manifestly a significant pay disparity between predominantly black jobs and generally white positions does exist.[13] The District Court found, however, that blacks had been employed in the best jobs available for which they qualified. The District Judge noted that railroads throughout the nation hire laborers and service workers (the categories of jobs comprising the crafts and classes which the Government labelled "Negro jobs") from the available manpower pool, and that this manpower pool in Jacksonville is predominantly black. Therefore, the court concluded, "any 'imbalance' in racial composition of respective jobs at the Company stems from the labor pool available, and from which the Company drew, and was not the result of any racial discrimination by the Company." 316 F.Supp. at 580–581.

Management practice has been to employ the "best qualified" person available at the time of a job vacancy. Terminal officials are familiar with, and assertedly have attempted to comply with, Title VII, as well as pertinent Executive Orders and United States contract requirements.[14] As early as August 2, 1962, the Terminal posted notices informing its employees that it is an Equal Opportunity Employer. It has sought qualified applicants from predominantly black schools in the Jacksonville area and has informed these institutions, as well as the Jacksonville Urban League, that it is an Equal Opportunity Employer. On July 1, 1965, the Deputy Contracts Compliance Officer of the Post Office Department notified the Terminal that its employment opportunity efforts had resulted in dismissal of the only complaints ever filed against that facility. Since the Act's effective date, Post Office Compliance Officers have allegedly continued to monitor Terminal performance, and no complaints have been received. Furthermore, in an October 1968 letter, the Deputy Contract Compliance Officer acknowledged receipt of the Terminal's affirmative action program and promised to consult the Terminal concerning any inadequacies. Ter-

---

11. Our figures are based on statistics compiled by the Terminal for the Post Office Compliance Officer. The Terminal's statistics reveal the number of hirings and promotions, by race, from the fourth quarter of 1965 through the fourth quarter of 1968.

12. Agreed Statement of Facts, No. 9 (filed as a Pre-Trial Stipulation on January 6, 1970).

13. Agreed Statement of Facts, No. 8 (filed as a Pre-Trial Stipulation on January 6, 1970). See also Government's Brief, Appendix A.

14. E. g., Executive Order No. 11246, 3 C.F.R. 339 (1965), as amended, 3 C.F.R. 406 (1969); Regulations, 41 C.F.R. §§ 60–1.1 to 60–20.6 (1971).

minal officials testified that none have been disclosed.[15]

Having weighed conflicting evidence, the District Court concluded that the Terminal had not discriminated in making initial job assignments. It found that "all applicants for jobs were informed of *all vacanices for which they might have possessed the requisite qualifications and were considered therefor upon the basis of qualifications alone.*" *Id.* at 580. (emphasis added). The court took cognizance of the fact that five of twenty-five black witnesses had affirmatively responded to the question whether each was "assigned" to the first job he held at the Terminal. Nevertheless, the District Judge also considered the fact that the personnel file for each of these five blacks indicated that he had received the position for which he had applied. Also, he noted that no black had complained about initial assignments, which could have been accepted or rejected. He did not deem black qualifications enhanced merely by graduation from high school—an educational level which some whites in higher-paying jobs had not attained. Nor did he mention that some jobs traditionally held by whites require no prior experience. (As examples, the Government cites: Apprentice in the Mechanical Department, Carpenter Helper in the Maintenance of Way Department, and Telegrapher and Switchman in the Transportation Department.) [16] Indeed, one white Switchman testified that he took the position in 1946 although he had only a fifth grade education and work experience limited to driving a laundry truck and working in a brewery.

In promotion and transfer as in hiring, the Terminal's policy has been to recognize "the best qualified person available with consideration being given to the rights of any employees possessing seniority entitling them by contract to bid upon the vacant job." *Id.* at 581. In transfer situations, collective bargaining agreements forbid retention of accumulated, Terminal, craft or class, or industry seniority. Moreover, employee transfer rights are limited. Ordinarily seniority acquired on one of the Terminal's thirty-five seniority rosters cannot be used for bidding on a job vacancy on another roster.[17]

The engine service crafts, however, present a paradox. In these crafts there are three separate seniority rosters: Firemen and Hostler Helpers, Hostlers, and Engineers. Individuals on the seniority rosters for these crafts fill positions in engine service. The basic collective bargaining agreement provides craft seniority in the crafts of locomotive Engineer and Locomotive Fireman. Employees accumulate seniority in each craft separately. However, firemen promoted into the Engineer craft retain their Fireman's seniority rights, and "hired" Engineers (those who have had engine service experience on other railroads) also are placed on the Fireman's seniority roster. This arrangement pro-

15. Government enforcement of the Executive Orders and their concomitant regulations has not been aggressive or coordinated. *See* Jones, Federal Contract Compliance in Phase II—The Dawning of the Age of Equal Employment Obligations," 4 Ga.L.Rev. 756 (1970); "Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964," 84 Harv.L.Rev. 1109, 1282–91 (1971). Such governmental ambivalence has engendered, or contributed to, employer compliance problems. *See, e. g.,* Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 983–985. *See also* Farmer, "Equal Employment Opportunity

—Case Study of Chaotic Administration," 44 Fla.B.J. 400 (1970).

16. In the context of Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, jobs requiring no prior experience or accumulated special skills in a multiclass craft would be characterized as "entry level" jobs in that craft.

17. The BRAC agreement contains an exception: an employee transferring from one job to another within the same class (group 1 or group 3) but on a different seniority roster may take one-half of up to five years of his accumulated seniority with him.

vides a stable engine service work force for the Terminal and regular employment for the employees by enabling them to flow back and forth among jobs in the engine service crafts until they have acquired enough seniority to work full time as Engineers. Consonant with the flow-back arrangement, there is no rigid line of progression in the engine service crafts. Although an employee may progress from Fireman and Hostler-Helper to Hostler to Engineer, a qualified individual may be hired directly into any job. The collective bargaining agreements do not allow retention or carry-over of seniority accumulated in a non-engine-service craft upon entry into the engine service crafts.

An employee possessing seniority in a particular craft or class is entitled, as a matter of contract right, to be provided with notice (through bulletin for an appropriate period in a designated location) of all vacancies or newly created positions within his craft and class; to bid on the vacancy or new position; to be awarded the position if the bidder has enough fitness and ability and is the senior eligible bidder; to be subject to involuntary layoff only after all those junior to him in his craft or class; and to select under some circumstances preferred working hours, off days, vacations, and other privileges based upon length of service. According to collective agreements between the Terminal and the Unions, seniority usually begins when the employee starts work in the craft and class to which he is regularly assigned. One who holds a temporary job (such as Christmas rush hires) or an emergency position (such as World War II trainmen and firemen or "set up" shopcraft helpers) remains vulnerable to replacement by a qualified applicant or an employee with contract rights to bid on the particular job. He accumulates no seniority and acquires no subsequent contract right to bid on any position in the craft or class where he performed temporary or emergency service. Union-management agreements proscribe inter-craft seniority transfers, both because few railroad crafts are functionally related and because each craft is controlled by a single contract negotiated by a specified labor representative. As noted earlier, however, the general proscription does not apply to some employees, who circumvent it by retaining seniority on separate craft rosters. Moreover, the collective agreements normally prohibit inter-class seniority transfers within a single craft, preventing employees from "rolling back" into lower positions.[18] Undisputably such restrictions discourage job hopping and promote employment stability. In a technical sense, they also lock all employees, both white and black, into certain categories; the declining employment propensity of the railroad industry magnifies this effect.

Within the limitations imposed by collective bargaining agreements, the Terminal is responsible for employee promotions. We have no reason to doubt the Unions' contention in this regard, and the District Court ostensibly accepted it as a postulate. Of course, if contract rights are applicable, the Terminal offers the vacant position to the senior qualified bidder. However, if no applicant possesses a contract right to bid for the position available, the Terminal chooses the "best qualified" individual who can fill the vacancy at that time. The Terminal has always posted notices concerning job openings in accordance with pertinent provisions of applicable collective bargaining agreements. Those provisions have usually dictated where the notice must be posted, what the notice is to state, and how long the notice should be posted. The agreements require only that such bulletins be published to the craft or class of employees possessing contract rights to

---

18. During force reductions, however, an employee confronted with involuntary layoff usually may exercise seniority to gain a position in a lower class within the same craft. *See, e. g.,* BRAC Rule 3; BRT Article 14; BMWE Rule 3; BRS Rules 22, 23.

bid on the new position or vacancy. On March 18, 1969, the Terminal unilaterally adopted a policy of posting notices of any job openings on all bulletin boards and in all bulletin books. The District Court found that the Terminal's officers and department heads periodically review qualifications of all employees to determine which employees can be advantageoously utilized in better positions. Commenting that there have been relatively few job vacancies during the time material to the issues here, the court concluded:

> The record established that each employee hired, promoted or transferred possessed the requisite qualifications and supports the Company's position that the best qualified person was hired, promoted or transferred to job vacancies.
>
> The relative qualifications of white and Negro employees who may have been competing applicants for specific jobs at specific times would be necessary to establish that Negroes possessed equal or greater qualifications but were not considered on account of their race while the white competitors were hired, promoted or transferred because of the racial factor.

*Id.* at 581–582 (footnote omitted). The court also held that certain employment tests utilized by the Terminal to assess qualifications for particular positions were nondiscriminatory. The Terminal asserts, and the District Court agreed, that racial discrimination has not been a motivational factor in promotion decisions at any material time either before or after Title VII's effective date.

Having reconstructed this backdrop, we turn to the specific departments, policies, and practices which the Government presents as the cynosures in this litigation.

## A. *Baggage and Mail Department*

On August 6, 1969, approximately 108 employees (seventeen white and ninety-one black) [19] performed nine different contract jobs in the Baggage and Mail Department. All were represented by the BRAC. Under the agreement between the BRAC and the Terminal, there are two classes, or "groups", in the department. The jobs of General Foreman, Chief Clerk, Stenoclerk, Foreman, and Assistance Foreman have been categorized as "group 1"; the jobs of Porter, Loader, Tractor Driver, and Separator have been classified as "group 3". The class distinction received governmental approval in General Order No. 27 discussed *infra*: group 1 jobs ostensibly require clerical skills, while group 3 jobs (generally laboring positions) require no particular training.[20] At least since 1962, there have been white employees in group 3 and black employees in group 1 positions. The District Court noted that at the time of trial in early 1970, three of the twenty-six group 1 employees were black, and thirteen of the 176 group 3 employees were white. *Id.* at 584 n. 14.

However, Terminal records do not disclose that any black was *hired* into a group 1 job in this or any other department within the BRAC's work jurisdiction; indeed, all blacks in the Baggage and Mail Department began their employment tenure in the group 3 job of Porter. Of the nine black employees in this department called as witnesses by the Government during presentation of its case, five (four of whom were hired before July 2, 1965) testified that they had not applied for any particular jobs at the Terminal. All five had, at least, graduated from high school. A sixth, who had had experience as a Mail Room Supervisor in the Air Force, applied for

---

19. The discrepancy among the departmental employment statistics utilized by the parties and by the trial court evidently has resulted from the compilation of these statistics at different times. Resolution of the controversy *sub judice* does not depend on selections of a particular party's figures, since the statistics considered as a whole are not mutually contradictory.

20. *See* U.S.R.R. Lab Bd Decision No. 630 (1923); General Order No. 27, Supp. 7 (1918); Interpretation 8 to Supp. 7 to General Order No. 27 (1918).

an equivalent position at the Terminal in 1957. Evidently Terminal officials determined that this would be the group 3 job of Mail Room Separator, rather than the group 1 position of Foreman or Assistant Foreman. Moreover, according to the witness, the Terminal's Assistant Baggage and Mail Agent stated that the Terminal did not hire Negroes for the latter jobs. (The Terminal began promoting blacks into group 1 jobs in December 1962. Since that date, three have received promotions to Assistant Foreman or Foreman on a regular basis.) All six blacks became Porters.

According to Terminal records, twenty-three of the twenty-eight whites working in the department as of December 1, 1969, began their employment in group 1 jobs. Of the remaining five, whose beginning jobs in the department were as group 3 Porters, four were hired after July 2, 1965. The fifth became a Porter in 1938 and advanced to Apprentice Assistant Foreman, a group 1 position, in 1939. Other than clerical aptitude, the Terminal ostensibly demands no formal educational prerequisite for group 1 jobs.

To rebut any inference as to racially discriminatory job assignments in this department, the Terminal presented evidence and testimony purportedly explaining the substantial concentration of blacks in group 3 mail handling positions. A Terminal witness testified that general economic conditions in the Jacksonville area are an important factor in determining the source of mail handling manpower for his department. Blacks have come to, and remained at, the Terminal because it offers better pay and job security than are otherwise available in the vicinity. Their employment applications uniformly show no educational background or prior work experience warranting employment in skilled jobs, *i. e.*, group 1 positions. Whites who possess similar qualifications and who are hired to work as group 3 mail handlers remain only temporarily because better opportunities exist in other industries and perhaps because they do not enjoy the manual labor required in mail handling. Contributing to this "unavoidable" concentration of blacks in group 3 is the fact that, although both whites and blacks are hired "on an approximately equal basis" for the annual Christmas mail rush, only blacks *apply* for post-rush permanent employment as extra-board Porters, the job classification of all Christmas extra help. "No one applies for a Group 3 job; they come in and say they want a job," the department head stated. However, blacks have been hired as Porters—because, as the Terminal emphatically argues, in many cases the applicant had previously worked for the Terminal in the same job "for which his then current application was made." Signed employment applications in Terminal files indicate that blacks have "applied" for the lower paying group 3 jobs, arguably supporting the Terminal's contention that no one has taken a particular position involuntarily. Further, the Terminal avers, the Government failed to show that vacancies in group 1 have existed at any material time.

The Terminal also points out that it has given certain black employees mail handling work as a favor to relatives who are employees. An example is Roderick Gray, who applied at the behest of his step-father Henry Young. Young asked the Terminal management to hire Gray to "help straighten him out" and stated in a minor's work release that his step-son was an applicant for the job of Porter. Young's action, the Terminal concludes, manifests that Gray sought work with his step-father and of the same type as that in which he had prior experience, *i. e.*, as a freight handler. The District Court agreed, concluding "from the demeanor and testimony of the witnesses and the content of pertinent exhibits that Mr. Gray actively sought the job he received and had no qualifications for any other job." *Id.* at 580. As to Young, the Terminal notes that although he testified he had been assigned to the job of Porter, he also

stated that he had applied for the position.

With respect to promotions in the department, the Government has argued that there are racially separate lines of progression. Of the seventeen whites hired before July 2, 1965, who were working in the department as of December 1, 1969, sixteen began in group 1 jobs. Depending on their entry positions, the whites have advanced from Apprentice Assistant Foreman to Assistant Foreman to Foreman and finally to General Foreman, all of which are group 1 jobs. The seventeenth white was hired as a Porter in 1938 and became an Apprentice Assistant Foreman in 1939. Conversely, all blacks have begun in the group 3 Porter job. From there they have advanced to Loader, Tractor Driver, and Separator. Since 1962 three blacks have been promoted to Assistant Foreman or Foreman. Prior to their promotions, they worked from fourteen to sixteen years in group 3 jobs.

Rule 4 of the agreement between the BRAC and the Terminal provides that covered employees shall be in line for promotion. Until the rule was amended on November 21, 1962, group 3 employees (all blacks) were specifically excluded from its scope of applicability. Blacks were aware that the pre-amendment rule precluded advancement in group 1 positions.

As we mentioned earlier, after amendment of the rule, three blacks have been given group 1 positions. The first was promoted in 1964, the second in 1966, and the third in 1967. The District Judge concluded that the pre-1962 rule

simply provided that seniority in Group 3 did not establish a *contract right to bid* and be considered for Group 1 jobs. Moreover, the record shows that the absence of such seniority rights is grounded in the functional differences between the skills (clerical as opposed to nonclerical work) which are required in jobs falling within the two groups. * * * More significantly, however, the record shows that it is the established practice throughout the railroad industry not to allow bidding rights to employees seeking to transfer between crafts, classes or jobs requiring unrelated skills. It is also significant that such rules apply similarly in areas where white employees hold jobs in the lower classifications. * * * The Government failed to prove any qualified Negro was denied advancement because of Rule 4 prior to its amendment, and it was unable to establish any racial discrimination resulting from Rule 4 prior to its amendment, and *a fortiori* there has been and could be no continuing racially discriminatory effect.

*Id.* at 585 (footnotes omitted).

On April 4, 1967, the Terminal began administering a personnel test to those seeking group 1 jobs in the department; personnel already holding group 1 positions were exempted from the examination. The Terminal's Chief Baggage and Mail Agent and his Chief Clerk developed the test along with a suggested grading scale. Currently, however, there is no minimum passing score. Moreover, there is no manual explaining administration or scoring. The District Court found that the test "relates to actual job requirements and was designed by professional railroad personnel. * * * The record shows that it was developed to screen employees to determine who might possess the clerical qualifications necessary for Group 1 job classifications. Test scores were but one of a number of factors considered in determining which employees might be qualified for work in Group 1 jobs." *Id.* at 583. In making this finding, the court necessarily chose between contradictory testimony delivered by two industrial psychologists, neither of whom evidently participated in the test's development or administration.

The Government challenges this finding because the test allegedly has been correlated to anticipated rather than actual job performance in group 1 positions. According to the Government, this measure of validity is inadequate;

and the District Court should have so found. Furthermore, the Government questions the manner in which the test has been administered, as well as the Terminal's utilization of scores in assessing promotability of blacks.

After the test had been developed, the Terminal, by posted notice, invited all group 3 employees interested in group 1 jobs to take it. Apparently this notice was the first ever inviting group 3 employees to apply for group 1 jobs. Group 1 positions generally involve clerical work; the initial prerequisite listed on the notice was "qualified typist." Since group 3 workers were aware that the group 1 jobs of Utility Clerk, Assistant Foreman, Foreman, and General Foreman involve no, or very limited, typing, the Government concludes that group 3 employees became apprehensive concerning the notice's sincerity.

During April fifteen blacks holding group 3 positions took the examination. None was promoted to a group 1 job after taking the test. Between May 1967 and August 1968, at least nine group 1 jobs were filled, all by newly hired whites who had scored higher than the blacks tested. One black testified that the department head had told him he failed the test, and others stated that they had never been informed of the results. The General Baggage and Mail Agent advised group 3 Separator Henry Young to review his arithmetic. Young scored five points higher on the arithmetic part than did J. A. Boswell, a white who became a Utility Clerk one month after Young took the test. Boswell, however, scored ten points more than Young on the whole test. Moreover, he entered the department with substantial clerical experience that Young did not possess.

Several Terminal officials responded to the Government's contentions by pointing out that the test was not the sole criterion for group 1 work; it has been given only to ascertain an individual's ability to read, write, and do basic arithmetic. For instance, Roger Stamper, a black group 3 employee, scored for-

ty-nine on the test during his group 1 probationary period. Nevertheless, the department head concluded for other reasons that Stamper would be a satisfactory Assistant Foreman, and Stamper subsequently acquired regular group 1 status. To validate the test by comparison with actual job performance would allegedly have been impractical: the Terminal would have become an experimental station for employees that might not have the ability to do the work. Finally, the Terminal asserts that group 3 employees are not required to take the test and pass, or otherwise achieve an acceptable score, to hold a group 1 job. Thus the test cannot be a term or condition of employment imposed on blacks but not on their white contemporaries.

B. *Accounting and Purchasing and Ticket Departments*

In August 1969, approximately twenty-five employees (eighteen white and seven black) performed fifteen different contract jobs in these two departments. Thirteen jobs are group 1 and two are group 3. As of December 1, 1969, all blacks hired into the departments have become group 3 Store Helpers or Store Laborers; all whites, except one, have begun in group 1 positions, such as Stockman or Apprentice Clerk. The sole white exception has been S. C. Woodward, who was hired as a Store Helper in 1938 then became a group 1 Ticket Seller in 1939.

Both departments are within the work jurisdiction of the BRAC. Consequently blacks have been subject to the group 3-group 1 transfer or promotion restrictions contained in the agreement, discussed *supra* in regard to the Baggage and Mail Department. Terminal records disclose that no black received a promotion from group 3 to group 1 until June 1969, when Nathaniel Sears became a Stockman. The District Court stated:

* * * Nathaniel Sears * * * testified that he had sought promotion to a Group 1 (Stockman's) job in 1967. The record shows that there are two Stockman's jobs, one of which

required typing, and that the job *not* requiring typing became vacant in 1967. That job was then filled by a Group 1 employee (J. W. Griffin) who previously held the other Stockman's job and who held seniority rights entitling him to bid on the vacant job. Thus, the Stockman's job remaining vacant was the one which required typing. Mr. Sears did not apply for it after being told that typing was a requirement since he could not type. The Stockman's job which does not require typing became vacant again in 1969, Sears was asked if he wanted to apply, he applied for it and was awarded it.

\* \* \* The Court finds no racial discrimination in this sequence of events nor in the job experience of Mr. Sears. The initial opening in 1967 was in the same Stockman's job which Mr. Sears now has. However, Mr. Sears did not have seniority rights entitling him to bid on that job and the employee awarded the job did (and, moreover, he had qualifications superior to those of Mr. Sears). The failure to accord Mr. Sears, and others similarly situated, such seniority rights cannot be said to be racially discriminatory.

*Id.* at 586.

## C. *Transportation Department*

As of August 1969, approximately 116 employees (ninety-four white and twenty-two black) worked in the department. Among the contract jobs in this department are those in engine service (Engineer, Hostler, Hostler Helper, and Fireman) and in Train service (Conductor and Switchman).

Blacks completely filled two departmental positions, Red Cap-Station Cleaner and Red Cap Captain. Only one black, Jessie Nesmith, worked in any of the other fifteen jobs. At the time this suit was filed, Nesmith was a Switchman; later he became a Conductor.

Formerly blacks shared the jobs of Fireman and Hostler Helper as well as that of Switchman. Partly because of agreements with certain Unions, the Terminal ceased hiring blacks for these positions. Later BLF & E agreements, to which the Terminal was a party, provided that no more than 50 percent of Fireman and Hostler Helper jobs could be filled by blacks. Steele v. Louisville & Nashville R. R., 1944, 323 U.S. 192, 195, 65 S.Ct. 226, 89 L.Ed. 173; *see* Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187. While *Steele* and *Tunstall* questioned the spirit of a 1941 BLF & E agreement, the letter did not succumb by judicial fiat until the Supreme Court decided Graham v. Brotherhood of Locomotive Firemen & Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22. From 1932 until 1967, the Terminal hired no blacks as permanent Firemen or Hostler Helpers. One black became a Hostler Helper in 1967. The District Court found that "[t]he employee with the lowest position on the fireman hostler-helper seniority roster who is presently working has a seniority date of 1951. \* \* \* [A]ll of these employees hired since 1964 have subsequently left engine service because of a lack of work. Three employees have worked in emergency as firemen hostler-helpers since 1965. These white employees did not acquire seniority for this temporary emergency service." 316 F. Supp. at 605–606. The court further said: "The Government also referred to terms of ancient collective bargaining agreements of the former BLF & E covering the craft of firemen, dating from 1930 and 1935 which were completely canceled in 1949. The Court specifically finds that there has been no effect or application of these agreements since they were canceled in 1949 and they are not relevant to any issue in this action." *Id.* at 607. (footnote omitted).

## D. *Mechanical Department*

Approximately 149 employees (eighty-seven white and sixty-two black) held thirteen different jobs in the Mechanical Department as of August 6, 1969. Blacks filled five of the jobs, while

whites predominated in the other eight. Three blacks have received transfers (or promotions) to formerly all-white positions; all were Machinist Helpers but became Machinists under a 1969 upgrading agreement. These employees have been placed on a special seniority list for upgraded Machinist Helpers but are not on the Machinist seniority roster.

Blacks employed in the department have begun in the jobs of Car Cleaner, Ice and Waterman, and Laborer. As of December 1, 1969, every black had entered the department in one of these positions.

Whites, except those hired as journeymen, have begun work in the department as Carman Apprentice, Machinist Apprentice, Electrician Apprentice, or Electrician Helper. Since the collective agreement between the Terminal and the shopcraft unions comprising System Federation No. 50 became effective in 1939, only one black has been hired into any of these jobs: he became a Carman Apprentice but progressed no further.

As in the other departments, blacks and whites have traveled different promotion paths. The former have been promoted from Car Cleaner or Ice and Waterman to Carman Helper and from Laborer to Fuel Oil Pumper or Machinist Helper. The latter, other than those hired as journeymen, have risen from Carman Apprentice to Carman, from Machinist Apprentice to Machinist, and from Electrician Apprentice or Electrician Helper to Electrician. White journeymen have also been promoted to Foreman. The record indicates that the qualifications prerequisite to employment as Carman Helper and Machinist Helper, jobs held by blacks, are substantially the same as those necessary for employment as Electrician Helper, a position filled by whites.

Pursuant to a 1942 upgrading agreement between the Terminal and the Federation Shop Crafts represented by System Federation No. 50, Electrician Helpers have been permitted to learn the skills of and be promoted to Electricians. Within certain limits the agreement permits Electrician Helpers to retain and accumulate Helper seniority while employed as Electricians. All affected employees have been white.

Under a 1969 upgrading agreement, Carman Helpers and Machinist Helpers, have been permitted to train as and be promoted to Carman and Machinist. Previously promotion had been precluded by Rule 24 of the collective agreement between the Terminal and System Federation No. 50, which restricted use of welding equipment to Mechanics (shopcraft journeymen) and their Apprentices. Consequently blacks, who were neither Mechanics nor Apprentices, could not acquire the training or experience necessary to qualify for more skilled positions. The 1969 agreement ostensibly remedied this problem. Its terms concerning seniority, however, are more restrictive than those in the 1942 agreement pertaining to the electrical craft.[21] The District Judge commented: "The record does show that an Electrician Helper performs more of the actual work of his craft (by necessity) than do Helpers in the Carman and Machinist crafts. This factor and the 27 year time gap explain any differences which exist between the two agreements, and the Court finds that the 1942 Agreement was not intended to, and did not, create, aid or perpetuate racial discrimination in employment opportunities." *Id.* at 590. He further found that the restrictive rules governing use of equipment had been predicated on legitimate business concerns: "the safety of the employee, his fellow employees, and the traveling public and the protection of the work and skills of the Mechanic and the welders' wage differential." *Id.* at 591 (footnotes omitted). He found no evidence that any black had ever tried to become an Electrician Apprentice, Electrician Helper, or Electrician. More-

---

21. 316 F.Supp. at 589 & n. 27.

over, no Helper has been promoted under the 1942 agreement since July 15, 1965.

Of the eight blacks called as government witnesses, "[n]one testified that he *should* have been hired initially in any job other than the one he obtained, and the record contains no evidence that any was qualified for any other job." *Id.* at 592–593 (footnote omitted). Although each witness expressed his desire for promotion, none would make the effort at the risk of losing seniority. The court determined that those who had applied for higher paying jobs were either unqualified, not as qualified as the white who received the positions, or not entitled by seniority to bid for the jobs. While some blacks testified that they had been "assigned" to their initial jobs, others indicated that race was not a factor in promotion.

### E. *Maintenance of Way Department*

On August 6, 1969, approximately twenty-six employees (thirteen white and thirteen black) worked in twelve different contract jobs. Blacks filled two of these jobs, and whites filled nine others. The remaining position, Welder Helper, was held by one white and one black; until 1966 it had been filled exclusively by whites.

No black has been hired for any job other than Laborer in this department. Only one has been promoted to a higher position: he became a Welder Helper on a temporary basis in 1966 and achieved permanent status in 1969.[22] Whites generally have begun employment as Welder Helpers or B & B Helpers (Carpenter Helpers), and have received promotions to Welder or Carpenter. Five whites listed on the Terminal's 1968 seniority rosters for the Bridge and Building and Roadway Subdepartments began their careers as Laborers; all remained in the job less than a year.[23]

The BMWE has represented all employees in this department. Rule 2 of the collective agreement provides for bulletining notices of vacancies and new positions. Until March 1969, the Terminal did not post such notices on bulletin boards assigned to Laborers, who have been totally black for years. The District Judge concluded:

> * * * The record shows that General Order No. 27, promulgated by the Director General of Railroads in 1918, provided that the seniority rights of Laborers, as such, will be restricted to their gangs. Similar provisions exist today in contracts on other railroads throughout the country. The fact that Section Laborers have no contract right to bid for other jobs in the Roadway sub-department reflects no racial discrimination; it is consistent with nationwide railroad practice. Moreover, the absence of such "contract rights" has not been and is not a bar to advancement as Laborers (including Negroes) have advanced to higher positions within the Department.

*Id.* at 587 (footnote omitted). Once again, the court found that no government witness questioned his initial job assignment; instead each expressed a desire for promotion. In every case, the District Judge stated that the best qualified man available at the time had gained the open position.

### F. *Signal Department*

Eight employees (all white) held three different jobs in this department on August 6, 1969. Terminal records disclose that no black has ever been hired for or transferred into this department. No black employee has ever been a member of the BRS, which has work jurisdiction over jobs in the department. The District Court concluded that no evidence of racial discrimination in the department

---

22. Later that year another black became a Welder Helper, 316 F.Supp. at 588.

23. Although there are no "lines of progression," every worker retains subdepartmental seniority in each job he has held. 316 F.Supp. at 612.

had been produced and thus no finding could be made.

### G. *Racially Segregated Locals*

#### (1) BMWE

Terminal employees who are members of the BMWE belonged to one of two local lodges at the time of trial. Local 539 has been comprised of whites; Local 2029 has been comprised of blacks. When Local 2029 was chartered in 1937, the BMWE constitution and by-laws provided for "allied" Negro locals, which were to be represented by delegates selected from white locals. The Union repealed these provisions in 1946, but evidently the news has been slow in reaching Jacksonville. The BMWE has not consolidated Locals 539 and 2029; it has recognized both as functioning components of its organization, even though all members of these locals are subject to the same collective bargaining agreement.

The Seaboard Federation of the BMWE has retained jurisdiction over Union members employed by the Terminal. At the Federation convention, every delegate casts one vote for each member of the lodge or lodges which he represents. According to a provision in the Federation's by-laws since 1955, the delegate representing both Locals 539 and 2029 votes for all members of these lodges during the convention. A member of Local 539 represented all BMWE Terminal employees at the two most recent conventions of the Federation. This delegate was elected solely by members of Local 539, the all-white group, C. L. Winstead, late General Chairman of the BMWE, testified that, to his knowledge, this has always been the situation at Federation conventions.

The District Court found no evidence that black BMWE members had attempted to terminate the existence of their lodge or to merge with the white local. In fact, Local 2029 members recently voted against merger with Local 539. Moreover, the court discerned no

situation in which specific lodge membership affects employment opportunities: there are no local hiring halls or referral systems, and the General Chairman of the Federation customarily handles grievances. Besides, in the "Seaboard Federation Negro employees have superior voting power both from the point of view of number of locals on (*sic*) the Federation and number of members, and votes are cast on the basis of the total membership in each local lodge." *Id.* at 614.

#### (2) BRAC

At the time of trial, Terminal employees represented by the BRAC belonged to one of two lodges, Local 1014 or Local 1575. All members of Local 1014 held group 1 jobs, and all members of Local 1575 held group 3 positions. Of the sixty-six members of Local 1014, sixty-three were white and three were black. Of the 204 members of Local 1575, 202 were black and two were white. No black joined Local 1014 until July 1968, and no white became a member of Local 1575 until June 1967. Although a racial qualification for local membership was eradicated in 1947, the BRAC has not consolidated Locals 1014 and 1575; both remain functional. Prior to March 1969, only the Local Chairman of Local 1014 received Terminal notification of group 1 openings, presumably because only incumbent group 1 employees have had contract rights to bid for such positions. In January 1970, the first black to be elected District Chairman of the two locals began handling grievances. His tenure commenced long after the Government had initiated the litigation *sub judice.*

Finding that neither the BMWE nor the BRAC had violated Title VII, the District Judge said:

[A]t all times material to this action none of the above-described defendant labor organizations has limited, segregated or classified its membership in any way which would deprive or tend to deprive any individual of

employment opportunities or would limit such employment opportunities or otherwise adversely affect his status as an employee or applicant for employment because of such individual's race. The separate BRAC and BMWE local lodges have existed on a voluntary basis since 1947 and 1946 respectively. Those defendant Brotherhoods have not maintained separate locals since those days in any sense other than failure to actually revoke local charters or force a merger of the locals, a power not given to the unions national officers except for good cause shown.

* * * The Court further specifically finds that the local lodges do not have jurisdiction or control over jobs at the Company, and the separate BRAC and BMWE local lodges have not been used or are being used as devices of discrimination with respect to hiring, promotion, job assignment or any other aspect of employment of the Company.

*Id.* at 615.

### H. *UTU Local 624–T and Black Yardmen*

Formerly known as the BRT, the UTU represents all Terminal Yardmen (a category comprised of Switchmen and Conductors). All regularly employed Yardmen—except Jessie Nesmith, a black Conductor—belonged to UTU Local 624–T at the time of trial. Although the Union has alleged in its brief that there are now black UTU members working at the Terminal, no current or former black Terminal employee had ever gained UTU membership when litigation began.

Since 1957 the BRT–UTU and the Terminal have had a union shop agreement. Nevertheless, Local 624–T has required only white Yardmen to join its ranks. Prior to 1960 the reason for the local's selectivity was obvious: the BRT, by constitutional provision, prohibited Local 624–T from admitting blacks. Three blacks, who had been Yardmen at the Terminal, testified that their membership applications were rejected at unspecified times.

After 1960 Local 624–T's General Chairman did not ask blacks to join, allegedly because of the monetary requirements imposed by its funeral benefit fund. Stated in 1956, the fund required everyone over fifty who joined the Union to pay two dollars a month for every month that he was past fifty. In May 1969, fund membership for such employees were made optional. However, the General Chairman testified that he had not invited Nesmith to join. The trial court found the Union's failure "to force Negro Switchmen to become members does not operate to discriminate against them because of their race or to adversely affect their employment opportunities. The Court further finds that membership in the UTU local is available to such Negro employees and they have not sought to become members." *Id.*

### I. *Toilet, Locker, and Shower Facilities*

At the time of trial, the Terminal maintained thirty-two different toilet, locker, and shower facilities for its employees. Some of these facilities have been internally partitioned; their utilization on a craft basis ostensibly has resulted in the segregation of blacks from whites. For example, one facility located at the repair track has been divided by a wall: Carman Helpers, all black, have utilized one side; while Carmen, all white, have used the other.

Separate facilities in the same areas have been segregated, assertedly by craft. Thus, of two facilities 100 to 200 feet apart, one has been used only by black Car Cleaners and Ice and Watermen; the other has been utilized only by white Carmen and Electricians. All these employees have worked in the same general area at the Terminal.

The Government contends that the arrangement is indicative of racial discrimination. The Terminal denies any racial intent or motivation. After a personal visit, the District Judge found that many facilities are used by both

blacks and whites, and that their use has not affected anyone's employment opportunities.

## II.

Our extraordinary regurgitation of evidentiary data has been necessary for two reasons. First, there is no pertinent precedent in this industry: the Government has never before applied Title VII to a railroad facility, where a multitude of interested parties further complicate already complex problems of proof. Second, and more important, this is a "pattern or practice" suit, the resolution of which primarily depends on facts and the vantage point from whence they are perceived. Factual and legal events deemed relevant for one purpose or another span five decades of railroad history. The perspective chosen is all important in ascertaining which, if any, of these events elucidate the current employment situation at Jacksonville Terminal. Augmenting the decisional difficulties here is the fact that the industry is subject to the Railway Labor Act, 45 U.S.C.A. §§ 151–163, a statutory scheme which defendants contend precludes, or at least severely circumscribes examination of pivotal seniority issues under Title VII.

▇ Undeniably blacks, as a class, at the Terminal occupy the lowest pay plateaus at that facility. Undeniably, too, the Terminal, like other railroads and connected facilities, remains in a period of reduced employment; consequently even the most beneficent employer would find elevation of qualified blacks into higher paying, more substantial positions an onerous task. Certainly in this regard, the Terminal must continue to protect the jobs of incumbent whites. Assuming *arguendo* for the moment that past or present racially discriminatory conduct has occurred, white employees need not suffer displacement, layoff, or furlough merely to satisfy some court-imposed quota or black/white ratio. In light of this record, no one could argue that the Terminal has failed to zealously perform this aspect of its duty to employees.

Assuredly rigid craft and class seniority systems, which give persons already in a particular craft or class contract rights to bid on new and vacant positions in that craft or class, have impeded minority transfers and promotions. Blacks, who generally remain outside the higher paying crafts and classes at the Terminal, must stand in line to apply for jobs for which they have rarely been judged qualified.

Given these employment realities, however, the ultimate legal question remains: have either the Unions or the Terminal, or both, engaged in racially discriminatory activities after the Act's effective date, or within a reasonable period of time before that date, the consequences of which continue? Unless the answer to this question is affirmative, Title VII will not support judicial intervention or relief.

Naturally, the Government has contended that employer-union discrimination has been and continues to be rampant at the Terminal. To substantiate this charge, the Government has utilized both pre- and post-effective date conduct, all of which is allegedly discriminatory, and Terminal employment statistics. It asserts that the relevance of pre-Act conduct is assured partly because railroad employment is declining: decisions and agreements made many years ago arguably affect job competition after Title VII's effective date.

The Terminal and the Unions counter with the explanation that necessary business decisions in an historically determined setting have culminated in the current employment situation. A corollary argument is that employees have voluntarily chosen to enter or to remain in their positions; and thus the Government is acting as an officious intermeddler, trying to enforce changes for which there has been no demand. The Terminal suggests in passing that dissatisfied black employees may pursue other, presumably more palatable courses of action: appearance before the Ter-

minal's review board, utilization of the grievance-arbitration process, initiation of a fair representation suit under the Railway Labor Act, or presentation of charges to the EEOC or OFCC while preserving the opportunity to file an individual or class action under Title VII.[24]

## III.

■ In Title VII, as in other civil rights legislation, Congress did not intend that the words "pattern or practice" be esoteric or enigmatic in meaning. See United States v. West Peachtree Tenth Corp., 5 Cir. 1971, 437 F.2d 221, 227; United States v. Mayton, 5 Cir. 1964, 335 F.2d 153, 158–159. Under section 707(a) of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e–6(a), the Attorney General may file suit if he "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of" discrimination. Certainly the Attorney General must bear the burden of proving his allegations. However, where as here the Attorney General has alleged that *prima facie* neutral policies and practices have been the instruments of perpetuating racial discrimination, the District Court may not limit its consideration to "specific acts of racial discrimination in employment since the effective date of the Act." In this respect we share the Fourth Circuit's view:

Practices, policies or patterns, even though neutral on their face, may operate to segregate and classify on the basis of race at least as effectively as overt racial discrimination. Particularly is this so if a history of past discrimination is developed.

United States v. Dillon Supply Co., 4 Cir. 1970, 429 F.2d 800, 804; see Jones v. Lee Way Motor Freight, Inc., 10 Cir. 1970, 431 F.2d 245, 247–248, cert. denied, 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 988, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108; United States v. Hayes International Corp., 5 Cir. 1969, 415 F.2d 1038, 1040–1044. The Supreme Court recently signified its approval of such evidence. In Griggs v. Duke Power Co., 1971, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, the Court stated:

The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. *Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.*

(Emphasis added.) Ordinarily the relevance of pre-Act racial discrimination, unlike the taste of good wine, decreases with age. Thus in one case, a district judge, drawing an admittedly arbitrary line, limited an EEOC discovery demand

24. Commentators have often disparaged the efficacy of administrative alternatives in racial discrimination cases. E. g., Aaron, "The Union's Duty of Fair Representation Under the Railway Labor and National Labor Relations Act," 34 J. Air L. & Com. 167 (1968); Risher, "The Railway Labor Act," 12 B.C. Ind. & Com. L.Rev. 51, 93 (1970); cf. Platt, "The Relationship Between Arbitration and Title VII of the Civil Rights Act of 1964," 3 Ga.L.Rev. 398 (1969); Note, "Title VII, the NLRB, and Arbitration: Conflicts in National Labor Policy," 5 Ga.

L.Rev. 313 (1971). The judicial avenue to remedial relief in the railroad industry has been well established. E. g., Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; Steele v. Louisville & Nashville R. R., 1944, 323 U.S. 192, 207, 65 S.Ct. 226, 89 L.Ed. 173; Norman v. Missouri Pacific R. R., 8 Cir. 1969, 414 F.2d 73; Richardson v. Texas & New Orleans R. R., 5 Cir. 1957, 242 F. 2d 230, 234–236; Rolax v. Atlantic Coast Line R. R., 4 Cir. 1951, 186 F.2d 473; see 42 U.S.C.A. §§ 2000e–6(a), 2000e–5(g).

to a period of five years prior to the alleged violation. In so doing, he noted that "such period is deemed to be reasonable for the normal case absent some special showing of the need and relevancy of a longer period. None is present here." Georgia Power Co. v. EEOC, N. D.Ga. 1968, 295 F.Supp. 950, 954, aff'd, 5 Cir. 1969, 412 F.2d 462. Similarly another district judge concluded that examinations encompassing a six year period prior to the Act's effective date would shed reasonable light on post-Act conduct. Dobbins v. Local 212, International Brotherhood of Electrical Workers, S.D.Ohio 1968, 292 F.Supp. 413, 444.

Neither *Georgia Power Co.* nor *Dobbins* controls the case *sub judice* with respect to determining whether pre-Act conduct or practices occurred within a "material time" of the Act's effective date. To remove post-Act events from an historical vacuum, both district judges chose time-frames encompassing representative samples of employment activity. They sought the proper perspective from which they might ascertain whether allegedly innocuous activity was in fact so. The conclusion to be drawn from these and the other decisions cited is manifest: each case must depend on its own facts. Nevertheless, "reasonable" or "material" time cannot be so restricted as to distort the factfinder's perspective. In some cases, the trial judge must travel to the pre-Act source of post-Act conduct, so that he can accurately assess its implications.

Application of this principle in the present factual context yields the conclusion that the District Judge unnecessarily constricted the relevant. time-frame. A careful reading of the court's opinion discloses that the judge's definition of "material time" connoted, at most, a few years prior to Title VII's effective date and all years after that date but before delivery of his findings of fact and conclusions of law. In the normal case, such a limitation regarding relevancy of pre-Act conduct would be permissible. Presumably a significant number of personnel changes and policy applications

would occur during this period. Here, however, the general rule cannot apply. Events occurring at the Terminal in 1963, 1964, or 1965 do little to elucidate any underlying policy, pattern, or practice of discrimination—or nondiscrimination. Employment in the industry generally, and at this facility specifically, has declined for many years. Workers who have been furloughed from jobs in particular crafts or classes often use contract rights gained by seniority to bid for subsequently opened positions in those crafts or classes. Workers in other crafts or classes have fewer opportunities to gain these jobs than do those in expanding industries or facilities. It is a truism that, as the Terminal has commented, there are no "new" jobs in the industry. Analysis of events occurring within a few years of Title VII's effective date results in the obvious findings that the industry is reducing employment, that workers in higher paying crafts and classes do exercise seniority contract rights to gain other jobs in those same crafts and classes, and that the conjunction of these factors necessarily limits opportunities for new hires and incumbents in lower paying crafts and classes—an overwhelming majority of whom happen to be black. Of course, new hires and incumbents in higher paying crafts and classes—nearly 100 percent of whom happened to be white when the Government's complaint was filed—can no longer transfer or upgrade themselves as freely as they did in more halcyon days. Thus all employees are locked into present crafts and classes —albeit on different levels, each of which may be statistically defined as racially homogeneous. Since everyone regardless of race has suffered substantially the same type fate, racial discrimination must be nonexistent.

■ Within the purview of Title VII, the conclusion that racial discrimination does not exist cannot be founded on a finding that all employees are presently locked into certain categories. *See* United States v. Dillon Supply Co., *supra.* The District Judge's simple, reasonable

description of current affairs at the Terminal contributes little to clarification or resolution of the underlying issue: have the Terminal's and the Unions' present employment practices, policies, procedures, and agreements, ostensibly neutral on their face, frozen the *status quo* established by prior discriminatory employment practices? *See Griggs v. Duke Power Co., supra* at 431, 91 S.Ct. 849. Given the fact that black employees have been locked into certain job categories (concerning which there can be scant dispute), the District Court must determine who turned the key—and why. In this regard, the present employment situation in the railroad industry conjoined with the extant craft and class seniority system necessitates judicial cognizance of events which would be relegated to irrelevant antiquity in other, more dynamic industries.

For instance, crucial to the Government's case was the showing that formal and informal agreements negotiated between the Terminal and the BLF & E during the 1930s and 1940s required the exclusion of blacks from Fireman and Hostler Helper jobs and that such segregation has continued, with one brief exception, to the present day. Prior to effectuation of these overtly discriminatory Terminal-Union compacts, blacks had shared the positions on a percentage basis. In 1949 the *Graham* Court finally held the agreements invalid and enjoinable, ostensibly eliminating them as relevant pre-Act conduct. Subsequent events demonstrate, however, that what had been overt merely became covert. At the time of trial, the lowest position on the Fireman-Hostler Helper seniority roster was occupied by a white with a 1951 seniority date. No black was included on the roster, nor was any hired for the Fireman's job until 1967. Even in the railroad industry, there can be no realistic explanation for the fact that no black was hired for this position until 1967, eighteen years after *Graham* and sixteen years after the most recent seniority date on the roster. Assuming *arguendo* that blacks who had shared jobs governed by the roster moved to greener pastures prior to *Graham,* the conclusion that discriminatory agreements continued in spirit after that decision, and even after the Act's effective date, remains strong. Certainly the facially valid seniority system, complicated by addition of Engineers to the Fireman-Hostler Helper roster, does not detract from such an interpolation. Saddled with a seniority handicap, at least a generation of blacks have evidently been foreclosed from these jobs. (The black hired in 1967 does not appear on the active roster.) The time-span between the agreements and the trial is indeed great; yet the Government's proposition that the agreements and the current employment situation are causally connected— the perpetuating catalyst being the seniority roster—deserved serious consideration.

■ Also exemplifying the past's pertinence to the present is the black-white disparity in the Baggage and Mail Department. Before 1965 blacks occupied group 3 positions, while whites held group 1 jobs. Granting that a functional dichotomy between the two groups of jobs does exist, it is interesting *and relevant* to note that only one black could bridge the gap prior to the Act's effective date. Two others attained group 1 status after 1965. To substantiate its charge of racial discrimination in the department, the Government proffered evidence and testimony pertaining to the history of the Terminal-BRAC agreement. If the Government's view of the facts is accepted, what had been *de jure* policy excluding blacks from group 1 positions under the pre-1962 BRAC agreement as construed at the Terminal ostensibly became *do facto* practice after revision of that agreement. If the Terminal's view is accepted, any possible discrimination ended in 1962, ostensibly pretermitting consideration of pre-Act conduct. The Terminal contends that between 1962 and 1969, either incumbent whites have exercised contract

rights to bid for group 1 jobs; or new-hire whites have possessed superior qualifications for these positions. The clerical test developed in 1967 assertedly substantiates the Terminal's "superior qualification" argument. Apparently undermining this position, however, is the fact that the all-white pattern in group 1 jobs has been broken only three times since 1962. None of the blacks attaining group 1 status was a new employee, and all have admittedly performed satisfactory work although one's test scores were lower than those of group 1 whites employed since 1967. Conversely black hegemony over group 3 jobs decreased after Title VII's effective date. According to employment records, several whites have moved into group 3 positions, which blacks had held almost exclusively prior to 1965. Some explanation for this practice was necessary, and examination confined to post-Act conduct could not produce it. Only by comparing pre- and post-1962 Terminal hiring and promotion practices could the District Court have ascertained whether pre-Act discriminatory conduct persisted after the Act's effective date. In this respect we hold that the trial court's conclusory finding of nondiscriminatory application of the pre-1962 BRAC agreement *at the Terminal* was clearly erroneous. Ample evidence and testimony supported the Government's claim that no blacks could have been promoted to group 1 positions prior to 1962, even if they possessed the requisite qualifications. The court erred by premising its finding on a reading of the agreement and the national BRAC's affirmation of nondiscriminatory intent in its implementation rather than on actual utilization of its provisions at the Terminal.

In dismissing these and other examples of pre-Act discriminatory conduct proffered by the Government, the trial judge unnecessarily limited the scope of his inquiry; he disregarded proof of relevant antecedents influencing or explaining present practices. Manifestly, then, the District Judge misconceived the applicability of Title VII to *prima facie* neutral practices carrying forward discriminatory conduct. His conclusions that past events or practices have no probative value here and that, practically speaking, facially neutral present practices are irrebuttably nondiscriminatory were erroneous. *See, e.g.*, United States v. Sheet Metal Workers Local 36, 8 Cir. 1969, 416 F.2d 123, 131–132; Local 189, United Papermakers & Paperworkers v. United States, *supra* 416 F.2d at 988; Quarles v. Philip Morris, Inc., E.D.Va.1968, 279 F.Supp. 505. Deprived of an historical overview in these situations, Justice would surely be blind.

██ Just as individual acts and policies must be judged in the proper historical perspective, those acts and policies must be examined in the context of the total employment picture. In a Title VII "pattern or practice" case, an employer's failure to hire or promote one black may prove nothing. Once the single or isolated incident barrier is passed, determination of the existence *vel non* of a racially discriminatory pattern or practice must depend on the quantum of proof presented in each case. No precise mathematical formulation is workable, nor did Congress intend to impose any racial constants. Certainly, however, an employer's failure to hire or promote all or the great majority of blacks while he concurrently hires or promotes whites may well indicate racial discrimination. To clarify its contentions *sub judice*, the Government compiled statistical evidence and exhibits pertaining to the racial composition of total employment at the Terminal, of the various departments, and of jobs held in these departments. Based on both pre- and post-Act Terminal employment records, these figures remain undisputed; and we adverted to them in our description of the Terminal departments. Although the statistics do not establish a *prima facie* case of discrimination, they do prove that employment at the facility is approximately equally divided between whites and blacks, that whites generally occupy the higher paying positions, and that blacks hold the lower

paying jobs. The statistics also show that almost all Terminal jobs were held exclusively either by whites or by blacks before July 2, 1965, and that this division has continued, with few exceptions, after that date. (The exceptions involve hiring of whites for group 3 Porter jobs and promotion of blacks to formerly all-white positions. Almost all of these changes occurred after the Government instituted this litigation.) Terminal records disclose that the persistence of "black" and "white" jobs—whatever their formal denotation—has not been caused by failure to hire new personnel. While total employment at the Terminal has decreased during the post-Act years, hiring has continued. Moreover, as noted earlier, all blacks hired during this period, have become Porters. Promotions too have occurred. Blacks have gained a few supervisory positions in the Baggage and Mail Department and two Helper jobs in other departments. "In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts." Jones v. Lee Way Motor Freight, Inc., *supra*, 431 F.2d at 247; *accord*, Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687 [1971]; Lea v. Cone Mills Corp., M.D.N.C.1969, 301 F. Supp. 97, 102 aff'd, 4 Cir. 1971, 438 F. 2d 86. When the Attorney General initiates a "pattern or practice" suit, he is entitled to utilize evidence of statistical probability to infer the existence of such discrimination. United States v. Sheet Metal Workers Local 36, *supra*, 416 F.2d at 127 n. 7. Certainly the weight to be accorded this inference varies: much depends on the correctness, completeness, and comprehensiveness of the figures proffered. Measured by these criteria, the Government's statistics *sub judice* should have been given substantial weight. They disclose that all persons hired for higher paying positions and most people promoted to these jobs after Title VII's effective date were white. Absent explanatory evidence and testimony, the statistics indicate that of-

ficials have impliedly equated job qualifications with race. *See id.* at 127; Lea v. Cone Mills Corp., M.D.N.C. 1969, 301 F.Supp. 97, 102. In a Title VII case, such implications are important. When combined with other evidence and testimony, they may be conclusive.

■ The District Court, however, rejected this evidence. Instead, the court relied heavily on testimony of Terminal and union officials, who averred that post-Act employment decisions have been racially neutral. The District Judge noted with scant explanation that Terminal officials hired or promoted the best qualified persons available for the particular jobs which they wished to fill. We cannot accept the assumption that the Government's statistics have no probative force: i. e., "[t]he Government's failure or refusal to undertake a comparative evaluation of the entitlement to job vacancies of competing Negroes and whites, upon the basis of individual qualifications, leaves the record without probative evidence to support [the contention that black employees were not even considered for jobs to which whites were promoted or for which they were hired]." 316 F.Supp. at 581. The trial judge's pronouncement cannot function as a general rule. It becomes valid only when the employer or union evidentially demonstrates that objective criteria pertinent to the particular job are the determinants of who is "best qualified." Thus, momentarily reserving discussion of the weight to be given statistical evidence in specific situations, we hold that the court erred in failing to evaluate the witnesses' protestations of racial neutrality in light of the total employment picture at the Terminal.

■ Finally, the District Court properly placed the onus of proving "intent" on the Government. To initiate a "pattern or practice" suit, the Attorney General must have "reasonable cause to believe * * * that the pattern or practice is of such a nature and is intended to deny the full exercise of [Title VII] rights. * * *" 42 U.S.C.A. § 2000e–6(a); *see* United States v. Inter-

national Association of Bridge, Structural & Ornamental Iron Workers Local 1, 7 Cir. 1971, 438 F.2d 679, 680–681. Moreover, before granting injunctive or affirmative relief, the district court must find that the defendant "has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint. * * *" 42 U.S.C.A. § 2000e–5(g). However, the Government *need not prove a specific present intent to discriminate.* This Court recently concluded:

> * * * [T]he statute [42 U.S.C. A. § 2000e–5(g)] requires only that the defendant meant to do what he did, that is, his employment practice was not accidental. * * *
>
> * * * * * *

Here, as in *Dobbins*, the conduct engaged in had racially-determined effects. The requisite intent may be inferred from the fact that the defendants persisted in the conduct after its racial implications had become known to them. Section 707(a) [42 U.S.C.A. § 2000e–6(a)] demands no more.

Local 189, United Papermakers & Paperworkers v. United States, *supra*, 416 F. 2d at 996–997; *see* Clark v. American Marine Corp. E.D.La.1969, 304 F.Supp. 603–607; Dobbins v. Local 212, International Brotherhood of Electrical Workers, *supra*, 292 F.Supp. at 448; Quarles v. Philip Morris, Inc., *supra*, 279 F. Supp. at 517–518.

 In sum, we agree with the District Court's delineation of the burden of proof insofar as it required the Government to produce a preponderance of the evidence establishing a pattern or practice of racial discrimination after Title VII's effective date. However, having considered the record and the findings of fact and conclusions of law, we are convinced that the District Judge unnecessarily limited the scope of relevancy, and thus saddled the United States with an impossible burden of proof in this case. Manifestly every hiring, promotion, or transfer decision consummated after the Act's effective date is a specific intentional act. Whether such an act is racially discriminatory cannot be determined merely by analysis of the subjective motivations of the decisionmakers. Here Title VII demands that post-effective date events be considered in light of relevant employment history and the total employment picture. Only in this manner can the court ascertain whether assertedly objective employment decisions have been in fact nondiscriminatory. Moreover, the Act proscribes facially neutral practices perpetuating the effects of past discrimination. If the practices have racially determined effects, proof of subjective intent to discriminate is unnecessary; the Government must show only that the defendant intended to perform the discriminatory act. Having established these premises, we turn to consideration of the trial court's specific conclusions of law.

## IV.

As the Terminal has argued, the Government did not challenge actual hiring decisions by Terminal officials. Nevertheless, the Government did charge that initial job assignments were uniformly made on a racially discriminatory basis. The District Court held the Government failed to prove "[t]hat race formed any basis for the Company's initial job assignment policies. * * *" 316 F. Supp. at 616. In reaching this decision, the court found that the Terminal has employed the best qualified person available at the time of a job vacancy, that all applicants for jobs were informed of all vacancies for which they might have possessed the requisite qualifications, that blacks were not assigned to specific jobs but applied for them, and that black employees have been employed in the best jobs available at the time of employment for which they qualified. Furthermore, the District Judge determined that the Terminal had promulgated a nondiscriminatory hiring policy prior to the Act's effective date and had publicized its position as an Equal Opportunity Employer.

Even the Government would agree that the Terminal has been an Equal Opportunity Employer, at least in the sense that it has not denied blacks employment after Title VII's effective date. Nevertheless, it argues that initial job assignments, reflected in the racial composition of jobs held in the various departments, belie the claim that blacks possess "equal opportunity" at the Terminal. This is a serious charge, ostensibly supported by the statistical evidence produced. In evaluating the contention that initial assignments have been racially discriminatory, and the District Court's contrary conclusion, we rely primarily on post-Act employment statistics compiled by Terminal officials for the Post Office Compliance Officer, as well as pertinent testimony given at the trial.

According to the statistics, the Terminal hired no blacks between October 1, 1965, and June 30, 1967. During that period, the employer hired forty-two whites. The list of positions which these new employees filled is extensive; it clearly covers a broad spectrum of employment responsibilities, pay levels, and promotion opportunities at the Terminal. Messengers, Telegraph Operators, Carmen and Carman Apprentices, Hostler Helpers, and a President and General Manager—to enumerate a few—were hired during these post-Act months. In the third quarter of 1967, the Terminal hired its first four new blacks; all became Baggage and Mail Porters. During that same quarter, it employed nine whites—two Carmen, six Baggage and Mail Clerks, and one Baggage and Mail Porter. Later that year the employer hired four more blacks; they too became Porters. It also hired three whites—one Stockman, one Welder Helper in the Roadway Subdepartment, and one Helper in the Bridge and Building Subdepartment. Further specification would be superfluous. It is enough to mention, as we did earlier, that the Terminal employed eleven blacks between October 1, 1965, and December 31, 1968. All were assigned to Porter jobs. During the same period, the Terminal employed sixty whites, of whom only three began their Terminal careers as Baggage and Mail Porters.

To refute the inference thus established and to buttress its own claim that post-Act hiring has been predicated on only two factors—existence of a vacancy and intention to assign the best qualified individual available to that position, the Terminal produced testimony of supervisory officials, who verbally reviewed the resumes and job performance of whites hired after the Act's effective date. In this respect it is important to recognize that job opportunities in the railroad industry, and at this facility, have not been abundant in recent years. Indeed, total employment has declined. Consequently workers furloughed or layed-off from jobs at one railroad-oriented facility would naturally apply for identical or similar jobs at other facilities. This condition is continuing. Thus, at any given time, there may be more experienced railroad workers searching for jobs in the industry than there are job openings. Furthermore, we are cognizant of the District Judge's finding that

> [t]he Company has no rigid or mandatory "entry level" jobs or "lines of progression." Any job can be and has been an "entry level" job in the sense that a job applicant or an employee desiring transfer within the Company can, subject to job availability, be hired into or transferred to any job for which he possesses the requisite qualifications. Similarly, there are no jobs for which there is required, as a condition precedent, service in a lower job classification at the Company.

316 F.Supp. at 582. Finally, we are aware that the Terminal considers itself an Equal Opportunity Employer and has advertised this claim in the black community.

In light of employment realities and the employer's stated policy, the issue which most concerns us is the actual

meaning of the term "best qualified" as understood and applied by Terminal officials. Preliminarily we discount the assertion that blacks were not "assigned" to but "applied" for Porter jobs. To conclude that blacks hired after the effective date of the Act became Porters because they consciously, intentionally chose to apply solely for this position strains even our credulity. Moreover, it implicitly qualifies the finding that blacks were informed of all openings in jobs for which they might qualify. If blacks hired after July 2, 1965, applied only for Porter positions, either these were the only jobs available when they were hired or these were the only available jobs for which they might qualify. Given the number of unskilled and semiskilled jobs performed at the Terminal, the latter conclusion—that blacks might qualify for none but the Porter position—is ludicrous. No job assignment based on this shallow conclusory foundation could withstand Title VII's remedial force.

However, Terminal witnesses have propounded a more substantial reason for the job assignments. Those responsible for hiring and initial assignments recounted many instances in which they had given the "best qualified" individual available a certain job. Often these officials were able to place in skilled jobs persons who had had experience in those same positions, either on the railroads or in other industries. Sometimes they hired individuals who had no experience in the particular job but who had experience in helper or apprentice-type jobs in the same craft or class. In other cases, particularly for clerical positions, Terminal officials chose new personnel who had no work experience but who had attained a certain educational level. For example, applicants who had gained typing or shorthand training in business schools were deemed more qualified for clerical positions than those who could show merely a high school diploma. Considered as a whole, the testimony reveals that supervisory personnel believed

they were assessing applicants' qualifications in terms of job-related attributes, not race, after the Act's effective date.

All of the persons so hired were white. In a stable or expanding industry, this fact would be damning, especially in regard to unskilled or semiskilled positions. Nevertheless, in the railroad industry, there is a plausible racially neutral explanation for the post-Act predominance of white workers in these jobs. The continuing decline in total employment compels many white workers experienced in skilled jobs to take employment in related unskilled or semiskilled positions, or face unemployment. For instance, a Welder may find work as a Welder Helper, while he hopes that employment will again increase and he can regain his old job. Naturally this rollback tendency handicaps applicants who do not possess the skilled worker's qualifications. Manifestly the applicants who suffer most in competition for these jobs are black. Having been excluded from any but the most menial tasks in pre-Act years, they remain outside in post-Act times. Job assignments previously based on racial considerations are now founded on legitimate qualifications, but the result is the same.

■ That blacks are disadvantaged in job competition does not, however, constitute a Title VII violation *per se*. Although Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act, it certainly did not desire to melt job qualifications having no racially discriminatory ingredient or controlling pre-Act antecedent. In light of Title VII's legislative history, ascribing such an altruistic yet impractical purpose to that legislative body would surely be erroneous—"reverse discrimination" of the most blatant sort. *See, e.g.,* Quarles v. Philip Morris, Inc., *supra* 279 F.Supp. at 516–517; 42 U.S.

C.A. § 2000e–2(h).[25] Throughout their testimony, Terminal officials reiterated that post-Act initial job assignments were made freely and were based on qualifications, or merit. Alleging that the qualifications deemed pertinent were job related, they scrupulously avoided reference to the craft and class seniority systems as a factor in assignment decisions.

Rather than attempt to contradict this testimony by showing that qualifications were not job related or that whites were preferred over blacks possessing equal or superior qualifications, the Government chose to stand on statistics elucidating post-Act employment disparities. According to the Terminal's post-1965 seniority rosters, only Roderick Gray among the Government's principal witnesses was in a position to and did give testimony concerning a specific post-Act hiring and initial job assignment decision. In light of the Terminal's business rationales offered in rebuttal, his testimony alone cannot suffice to substantiate the allegation that the employer's post-Act initial job assignment decisions were part of a pattern or practice of racial discrimination. Once Terminal officials proffered justifying explanations for their actions, the Government should have shown that stated policies and assignment realities did not coincide after July 2, 1965.

To make such a showing, the Government must have proved that whites received job assignments denied blacks, that the jobs were available when the blacks applied, and that the blacks' qualifications were equal or superior to the hired whites'. The United States, as well as individual complainants, has successfully shouldered this burden in the past. In some situations, when blacks have been excluded from white jobs for no apparent reason, statistics have carried the day. Because blacks were denied certain jobs regardless of qualifications, little or no corroborating evidence revealing specific instances of post-Act exclusion was necessary. Most cases in this category have involved facially neutral transfer and promotion systems influenced by pre- or post-Act discrimination. *See* Bing v. Roadway Express, Inc., *supra;* Jones v. Lee Way Motor Freight, Inc., *supra,* 431 F.2d at 247–248; United States v. Dillon Supply Co., *supra,* 429 F.2d at 803–804; United States v. Hayes International Corp., *supra;* Quarles v. Philip Morris, Inc., *supra.* Others have concerned discriminatory union referral or seniority arrangements. *See* United States v. International Brotherhood of Electrical Workers Local 38, 6 Cir. 1970, 428 F.2d 144, cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L. Ed.2d 248; United States v. Sheet Metal Workers Local 36, *supra;* Local 189, United Papermakers & Paperworkers v. United States, *supra;* Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047. None supports the proposition that employment statistics outweigh a defendant's evidence manifesting a "business necessity" for job assignment decisions. Moreover, no transfer and promotion system described in these cases is analogous to the Terminal's post-Act imposition of a "best qualified" hiring standard. All involved qualification factors found extraneous to the particular job, and thus violative of Title VII. Consequently we do not consider any of these decisions dispositive of the initial job assignment issue *sub judice.*

More pertinent are the few hiring and initial job assignment cases decided by this and other courts. As in the transfer and promotion situations, plaintiffs have demonstrated that employer perversion of ostensibly objective hiring policies after the Act's effective date discouraged any blacks from applying for, or precluded them from gaining, "white"

---

25. *See also* Craig, "Race Discrimination and Title VII of the Civil Rights Act," 21 N.Y.U. Conf.Lab. 115 (1968); Vass, "Title VII: Legislative History," 7 B.C. Ind. & Com.L.Rev. 431 (1966); 1964 U.S.Code Cong. & Admin. News, p. 2355.

jobs. *See, e.g.,* Parham v. Southwestern Bell Telephone Co., 8 Cir. 1970, 433 F.2d 421, 426–427; Jones v. Lee Way Motor Freight, Inc., *supra,* 431 F.2d at 247; Lea v. Cone Mills Corp., *supra,* 301 F. Supp. at 102; *cf.* Diaz v. Pan American World Airways, 5 Cir. 1971, 442 F.2d 385, 386 [1971]; United Packinghouse Workers v. NLRB, D.C. Cir. 1969, 135 U.S.App.D.C. 111, 416 F.2d 1126, cert. denied, Farmers' Cooperative Compress v. United Packinghouse, etc., 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179. Alternatively they have evidenced their qualifications for the jobs sought, thus engendering doubts as to the existence of objective nonracial criteria. *E.g.* Cypress v. Newport News General & Nonsectarian Hospital Association, 4 Cir. 1967, 375 F.2d 648, 654–656, 660–616.

In the evidentiary posture of this case, the importance of choosing the latter, more difficult method of proof—*i. e.,* presenting specific evidence of blacks' qualifications for jobs denied them—cannot be overstressed. In *Local 189, supra,* 416 F.2d at 988, Judge Wisdom posed the hypothetical of an employer demand that typing skills be a qualification for secretarial positions. Writing for this Court, he stated:

> [U]nquestionably Negroes, as a class, educated at all-Negro schools in certain communities have been denied skills available to their white contemporaries. That fact would not, however, prevent employers from requiring that applicants for secretarial positions know how to type, even though this requirement might prevent Negroes from becoming secretaries.

Likewise, in *Dobbins, supra,* 292 F.Supp. at 445 n. 15, Judge Hogan noted that "[t]here is no such thing as an 'Instant Electrician'—by Court decree or otherwise." Concerning the burden of proof, he concluded: "To make out a prima facie case for class purposes, as distinguished from individual purposes, the plaintiff has the burden of showing the existence of a significant number of members of the group possessing the basic skill in the particular trade involved." *Id.* at 445–446. In *Quarles, supra,* 279 F.Supp. at 510, Judge Butzner indicated that consonant with Title VII an employer may impose reasonable qualifications for supervisory positions—as long as discrimination is not a factor in their conception or implementation. Commenting that plaintiffs had failed to show any instance of a qualified Negro being denied employment or promotion to a supervisory position, he denied relief on this issue. Recently Chief Justice Burger uttered what may be the last word on this issue. In Griggs v. Duke Power Co., *supra,* 401 U.S. at 430, 91 S.Ct. at 853, he said:

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

> Congress has now provided that tests or criteria for employment or promotion may not provide equality of opportunity only in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition of the job seeker be taken into account. It has—to resort again to the fable—provided that the vessel in which the milk is proffered be one that all seekers can use. The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job

performance, the practice is prohibited.

▉ In the record before us, we find substantial evidentiary support for the contention that the Terminal has discriminated in favor of neither the stork nor the fox in making initial job assignments. Given the legitimate nondiscriminatory business justifications presented in individual cases, we conclude that the Terminal has passed the "business necessity" test—at least insofar as general policy and practice governing initial job assignments are concerned.[26] The Government, confronted by the Terminal's evidence, only feebly attempted to refute it. Thus, having shunned the burden of augmenting its statistics, the Government's challenge in this regard must fail. In reaching this conclusion, we have been cognizant of the facts that the employer can draw from a large pool of skilled labor to fill vacant positions, that the post-Act initial job assignment system is subject to no historically discriminatory antecedents, and that the Government has produced a paucity of proof pertaining to racial bias or subjectivity in utilization of the facially neutral "best qualified" standard.

### V.

In charging that the Terminal's promotion and transfer policies and practices contravene Title VII, the Government stands on more stable ground. Unlike initial job assignments, promotions and transfers at the Terminal are governed partly by factors antedating July 2, 1965. The craft and class seniority systems in use at the Terminal comprise one such variable: the Government has specifically cited these systems, which influence most promotions and transfers, as having a discriminatory impact on blacks. Ubiquitous in the railroad industry, these systems were in principle identical throughout; yet the Government contends that they are not in fact the same. In pre-Act times, the Government argues, the systems were yoked with discriminatory hiring practices to achieve racial inequality in the higher paying crafts and classes at the Terminal. Consequently the Government here asserts that continued post-Act application of these facially neutral systems, mandated by collective bargaining agreements[27] between the Terminal and the Unions, unlawfully perpetuates the effects of past discrimination. The District Court disagreed, concluding that the Government had failed to prove racial bias in the adoption or implementation of any seniority system at any time material to this litigation. The District Judge predicated his conclusion on findings that the systems are identical at railroad facilities throughout the Nation; that whites and blacks similarly situated are subject to the same provisions controlling transfer and accumulation and retention of seniority; and that the seniority systems promote stability and integrity in classification of work and qualification rules

---

26. Our conclusions concerning initial job assignments do not encompass the Baggage and Mail Department's personnel test or job criteria in that department. These problems are discussed in Part VI *infra*.

27. In Transportation-Communication Employees Union v. Union Pacific R.R., 1966, 385 U.S. 157, 160–161, 87 S.Ct. 369, 17 L.Ed.2d 264, the Supreme Court enunciated distinctions between collective bargaining agreements and other types of contracts. Speaking for the Court, Mr. Justice Black stated:

\* \* \* A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. \* \* \* " \* \* \* [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. \* \* \* The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." \* \* \* In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage, and custom pertaining to all such agreements. (citations omitted).

—which, in turn, ensure the safe and efficient operation of the Terminal by making the most qualified individuals available to management.

Considered in the abstract, the trial court's conclusion upholding the seniority systems in effect at the Terminal is reasonable. Nevertheless, in light of relevant employment history and present racial dichotomies among the crafts and classes at that facility, the court's holding was erroneous. In this respect we need not quarrel too much with the District Judge's actual findings of fact, for it is clear that he unduly limited these findings to a period contemporaneous with that of Title VII. Even a cursory glance at Terminal seniority rosters discloses that employees in the higher paying, skilled crafts and classes have pre-Act seniority dates. On some rosters the most junior employee now active began serving in the craft or class in the early 1950s. Furthermore, evidence and testimony indicate that the great majority of these employees are white; almost all were white before the Government initiated this litigation. It may well be true, as the Terminal and the Unions have argued, that whites and blacks similarly situated enjoy the same contract rights and endure the same transfer restrictions. In reality, however, precious few whites and blacks are—or have been for many years—similarly situated at the Terminal.

Manifestly post-Act utilization of the seniority systems' inter-craft and inter-class transfer impediments, while benefitting the employer and those already at higher pay levels, perpetuates this racial disparity. Although he recognized the dichotomy, the District Judge, shackled by belief that any possible pre-Act discrimination was too remote in time and therefore irrelevant, declined to seek its source. Having limited the span of "material time," the court evidently rejected the Government's proof of pre-Act racially discriminatory agreements between the Terminal and several Unions. Moreover, the District Judge failed to consider statistical evidence

corroborating the hypothesis that all Unions, with the employer's cooperation, had engaged in pre-Act racial discrimination and that the facially neutral seniority systems have perpetuated such discrimination whenever they have influenced post-Act promotion and transfer decisions.

 Having reviewed the record, we conclude that pre-Act racial bias has effectively excluded blacks from higher paying crafts and classes at the Terminal. In reaching this conclusion, we find that the pre-Act connotation given by the Terminal and the Unions to the term "promotable," which appears in several collective bargaining agreements, necessarily included racial bias. Five decades of employment history at this facility contradict the District Court's finding that the words "promotable" and "qualified" have been synonymous at all material times. While post-Act definitions of the terms may be interchangeable, it is obvious that—judged by any objective, non-racial standard—this has not always been so.

That the Terminal and the Unions engaged in pre-Act racial discrimination appears obvious. There can be no reasonable justification for the absence of blacks from all but the most menial craft and class seniority rosters. Nor is there any plausible nonracial explanation for the disappearance of blacks from jobs which they formerly shared and from which they might have progressed; no one has argued that blacks were inherently incapable of performing such jobs or that blacks as a race naturally recoiled from the work. Certainly the post-World War II employment recession in the railroad industry hastened the forced black exodus. Thus Jessie Nesmith, a black whose seniority dates from 1925, now seems curiously isolated in the all-white train service crafts. Uncounted other blacks have not shared Nesmith's good fortune in retaining at least a foothold in the higher paying crafts and classes; gradually their names have been eradicated from the Terminal's seniority rosters.

The explanation for the racial divisions in the various crafts and classes at this facility is not mystical, as the Terminal and the Unions seemingly contend. Instead, it is rooted in the history of employment relations at the Terminal, as the record shows. In Parham v. Southwestern Bell Telephone Co., *supra*, 433 F.2d at 426, the Eighth Circuit held as a matter of law that statistics, revealing that an extraordinarily small number of black employees worked in jobs other than those involving menial labor, established a violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e–2(a). *See, e.g.*, Lea v. Cone Mills Corp., *supra*, 301 F.Supp. at 102. In Jones v. Lee Way Motor Freight, Inc., *supra*, 431 F.2d at 247–248, the Tenth Circuit found that the employer had hired whites as line drivers and blacks as city drivers prior to July 2, 1965, and concluded that this fact established pre-Act racial discrimination. *See e.g.*, Bing v. Roadway Express, Inc., *supra*; Clark v. American Marine Corp., *supra*. The factual situation developed *sub judice* manifests pre-Act racial discrimination even more clearly than that presented in *Jones*. Here blacks not only performed jobs functionally identical to those held by whites; in fact, they performed the same jobs but were replaced by whites when railroad employment began to slacken.

■ To show pre-Act racial discrimination without evidencing post-Act effects does not establish a *per se* violation of Title VII. This was the underpinning for our holding in regard to the Terminal's initial job assignments. When seniority becomes an issue, however, the past becomes more important. The Terminal systems are illustrative. At the Terminal contract rights give employees the power to bid on vacant positions in their own crafts and classes; such rights also protect against encroachment by occupants of other crafts and classes. By virtue of the collective bargaining agreements in effect, the senior eligible bidder retains the right to be awarded any vacant position in his craft or class, if he possesses *sufficient* fitness and ability. Seniority, then, often becomes the ultimate determinant of promotions and transfers. If a member of a particular craft or class bids on a vacant position in his craft or class, his seniority precludes any outsider from gaining the job. Each time seniority functions as a factor in post-Act promotion and transfer decisions at the Terminal, pre-Act racial discrimination effectively handicaps the worker who has been the subject of such bias. Local 189, United Papermakers & Paperworkers v. United States, *supra*, 416 F.2d at 988. Judicial recognition of the fact that even facially neutral seniority systems can serve to perpetuate racial discrimination has prompted modification of such systems under Title VII, *E. g.*, Jones v. Lee Way Freight, Inc., *supra;* United States v. Dillon Supply Co., *supra;* Local 189, United Papermakers & Paperworkers v. United States, *supra;* Local 53, International Association of Heat & Frost Insulators v. Vogler, *supra;* Quarles v. Philip Morris, Inc., *supra*. "The Act proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation." Griggs v. Duke Power Co., *supra*, 401 U.S. at 431, 91 S.Ct. at 853.

The only distinction between the seniority systems in effect at the Terminal and those found discriminatory in the cases cited above is the former's tendency to permanently perpetuate the *status quo.* [28] Coupled with current employment reductions at the Terminal, the

---

28. For discussion of seniority in nonrailroad industries, see Cooper & Sobel, "Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion," 82 Harv.L.Rev. 1598 (1969); Gould, "Seniority and the Black Worker: Reflections on *Quarles* and its Implications," 47 Texas L.Rev. 1039 (1969); "Developments in the Law—Employment Discrimination and Title VII of the Civil Rights

seniority systems challenged here form unusually strong nexuses between discriminatory pre-Act conduct and racially neutral post-Act activity. For example, on several rosters the most junior white working for the Terminal has almost twenty years' seniority. If furloughed whites having less seniority bid on each vacant position in their crafts and classes, many more years may pass before a previously excluded black can be considered for a vacancy in one of the higher paying crafts and classes. In *Quarles* continued application of facially neutral seniority and transfer restrictions could not comport with Title VII because "Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act." Quarles v. Philip Morris, Inc., *supra*, 279 F.Supp. at 516; *accord*, Local 189, United Papermakers & Paperworkers v. United States, *supra*, 416 F.2d at 988; United States v. Hayes International Corp., *supra*, 415 F.2d at 1045. In the factual context *sub judice*, to say that the Terminal's seniority systems may well exclude a lifetime of black workers from higher paying crafts and classes is not conjectural hyperbole. Thus remedial relief here should certainly be consonant with congressional intent.

The Terminal, however, argues that the seniority systems, and transfer and promotion restrictions, as presently operated, are business necessities. *See* Griggs v. Duke Power Co., *supra*, 401 U.S. at 431, 91 S.Ct. 849; Jones v. Lee Way Motor Freight, Inc., *supra*, 431 F.2d at 249; Local 189 United Papermakers & Paperworkers v. United States, *supra*, 416 F.2d at 989. We have no doubt that the seniority systems and restrictions currently in force at the Terminal contribute to its safe and efficient operation. Nevertheless, as the Second Circuit most recently explained,

the "business necessity" doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. * * * Necessity connotes an irresistable demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. * * * If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued.

United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 662 [1971]. In other words, management convenience and business necessity are not synonymous. Thus the Terminal was required to prove not only that the seniority systems and restrictions promote safe and efficient operation but also that they are essential to these goals. Crucial to its justification was proof of the unstated predicate—that current occupants of a class or craft are necessarily the only employees qualified to fill vacancies in that craft or class. Otherwise, while inter-craft and inter-class transfer restrictions, as well as the seniority systems, comprise one method for promoting safe and efficient operation of the Terminal, they may not be the only feasible or practical *modus operandi*. Though convenient, they may not be necessary, and consequently must yield to Title VII remedial relief.

In propounding its argument here, the Terminal has implicitly de-emphasized the District Court's finding that there are no mandatory lines of progression at the facility—*i.e.*, no job requires, as a condition precedent, service in a lower job classification. The conclusion derivable from this finding is that craft or class seniority is not determinative of job qualification. To buttress its case,

Act of 1964," 84 Harv.L.Rev. 1109, 1155–64 (1971); Note, "Title VII, Seniority Discrimination, and the Incumbent Negro," 80 Harv.L.Rev. 1260 (1967).

the Terminal apparently relies on an earlier finding that

> [t]he record shows that only a few jobs at the Company provide training for other jobs. It is in these limited number of situations that service in one job accrues seniority rights to bid on a better job, a right given to the employee because of the certainty that he will be trained for the better job by service in the lower-rated job.

316 F.Supp. at 579. From this limited exception, the Terminal inductively concludes that all seniority systems and restrictions at the Terminal are necessary because they ensure that railroad-trained employees will fill vacancies in their own crafts or classes, despite the fact that no job requires service in a lower job classification. Thus, paradoxically, craft or class seniority becomes equated with job qualification—presumably the most senior worker in a particular craft or craft being the "best qualified" to fill a vacancy in that craft or class.

The inherent fallacy in this argument lies in one of the premises upon which seniority systems are based. Assuming that an individual is "qualified" for a certain position or class of positions, further inquiry concerning the degree of his skill becomes unnecessary. Longevity rather than qualification becomes the critical factor: the most senior qualified worker receives the job desired. Realistically, then, in seniority hierarchies established by collective bargaining agreement, comparative and superlative adjectives are superfluous: qualification, like perfection, is an absolute. The systems and their concomitant promotion and transfer restrictions protect those with work experience in particular crafts and classes but do not ascertain whether these are the only individuals qualified or the "best qualified" to hold positions in those crafts and classes.

In *Local 189* we examined "job seniority" in light of Title VII. The agreement there in force gave the most senior qualified employee in the next lower job slot the right to fill any vacancy in the position immediately above. Prior to Title VII's effective date, the employer had utilized racially segregated lines of progression, so that blacks would not bid on "white" jobs. When the separate lines later merged, the formerly "black" category became the bottom of the single line of progression. As a result, few blacks did, or could, benefit from the merger. Although the "job seniority" system was facially neutral, we concluded that it use was racially discriminatory and approved limited judicial modification. We explained:

> The translation of racial status to job-seniority status cannot obscure the hard, cold fact that Negroes * * * will lose promotions which, *but for* their race, they would surely have won. Every time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias. It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the *past* is to cut into the employees' *present* right not to be discriminated against on the ground of race. The crux of the problem is how far the employer must go to undo the effects of past discrimination. * * *

> * * * * * *

> A *"rightful place"* theory stands between a complete purge of "but for" effects [and] maintenance of the status quo. The Act should be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.

416 F.2d at 988. In adapting this theory to the *Local 189* factual situation,[29] Judge Wisdom did not demand prerequisite proof that incumbents in the former black line of progression could actually qualify for "white" jobs. Moreover, he did not discount the probability that some jobs might demand prior training or accumulation of skills unavailable to blacks. Under such circumstances the employer might legitimately deny certain jobs to these unqualified black workers. The touchstone would be business necessity rather than application of the *non bona fide* seniority system: the employer's justification being founded on proof that blacks could not meet objective criteria measuring threshold qualifications for these positions. Within these guidelines he placed the burden on the parties, under the district court's supervision, to delineate and implement corrective remedies.

Here we confront "craft and class" seniority systems and transfer restrictions. In many respects the definitional terms are analogous to "job seniority," and the practical effects of their utilization are certainly identical. Under neither system, job or craft and class, does the incumbent black enjoy equal opportunity, if prior racial discrimination has forced him into a subservient work category. In competition between a black and a white for a certain job, in a craft or class once populated exclusively by whites, the white, who may have greater craft or class seniority but who may have toiled fewer years in the industry, necessarily wins. Moreover, any black who does qualify for and gain a position in a higher paying craft or class must face the fact that current collective bargaining agreements at the Terminal generally prohibit retention of seniority in his former craft or class. If furloughed from his new position because of employment reductions, the black finds himself jobless.[30] If employment subsequently increases, he must compete again with more senior white workers for available jobs. In any industry loss of seniority is a critical inhibition to transfer. *See, e.g.,* United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 661; Jones v. Lee Way Motor Freight, Inc., *supra,* 431 F.2d at 248–249; United States v. Hayes International Corp., *supra,* 415 F.2d at 1044; Clark v. American Marine Corp., *supra,* 304 F.Supp. at 608. At the Terminal, where total employment has decreased in recent years and preservation of seniority has become essential to economic survival, this transfer impediment is indeed monumental. It cannot survive Title VII's remedial impact.

We hold that continued use of the craft and class seniority systems to restrict the transfer and promotion opportunities of incumbent black employees at the Terminal is neither *bona fide* nor a business necessity: such systems necessarily exclude blacks from jobs for which they might otherwise qualify. 42 U.S.C.A. § 2000e–2(a), (c). The Act imposes upon employers—with the assistance and cooperation of labor representatives—an affirmative duty to devise and implement pertinent objective criteria for determining what applicants for promotion or transfer are qualified to fill particular vacancies. Here, although previous experience in a particular job or type of jobs can be a crucial determinant of qualification, the employer's evaluation cannot be confined to *railroad* experience.[31] Black incumbents who have gained equivalent experience in other industries—*e.g.,* as clerks, electricians, or machinists—must be deemed qualified or unqualified on the basis of their performance in these industries, since racial discrimination has

---

29. *See generally* Note, "Title VII, Seniority Discrimination, and the Incumbent Negro," 80 Harv.L.Rev. 1260 (1967).

30. *See* BRAC Rule 15; BRT Article 14; BMWE Rule 3(b); BRS Rules 22, 23; BLE & BLF & E Article 13 (Supp. 1964); ORT Article 14(f); System Federation No. 50 Rule 20.

31. U.S.R.R. Lab. Bd. Decision No. 222 (1921), for example, does not delimit skilled workers' qualifications solely in terms of railroad experience.

prevented them from utilizing their skills at the Terminal. *See* Jones v. Lee Way Motor Freight, Inc., *supra;* United States v. Sheet Metal Workers Local 36, *supra,* 416 F.2d at 131–133; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra,* 407 F.2d at 1054–1055. Black employees qualified to fill vacancies shall have the right to bid for those positions on the basis of Terminal seniority (time worked for the employer) rather than craft or class seniority, under certain circumstances discussed *infra.*[32] In such situations the competitors' respective rights to these positions shall be determined on the basis of Terminal seniority.

We recognize that some railroad jobs may be unique, that there may be no analogues in other industries. Insofar as these few jobs are concerned, experience gained in other industries may be irrelevant. The Terminal has alleged but not proved this possibility. Therefore, upon remand, the Terminal shall bear the burden of proving that one of the *necessary* qualifications for a particular job is experience in the same or a related position in the railroad industry. *Cf.* Marquez v. Omaha Dist. Sales Office, Ford Motor Co., 8 Cir. 1971, 440 F.2d 1157, 1162–1163. In light of the District Court's findings quoted above, and the functional differentiations among jobs even in the same craft or class, the proof proffered should involve very few Terminal positions.

In many respects the Unions' arguments in favor of the *status quo* echo the Terminal's. Implicit in their briefs, however, is the additional *in terrorem* prediction that imposition of Title VII remedies would precipitate the demise of the craft and class seniority systems, which had their genesis in General Order No. 27 and have been nurtured through a half century by myriad collective bargaining agreements. These labor representatives fail to perceive that their pre-Act discriminatory policies, practices, and "understandings"— whether formal or informal—have compromised the racially neutral integrity of that venerable Order and its interpretative supplements. Moreover, "[n]o problem so vast and intricate as that of doing practical justice to the * * * railroad employees of the country can be regarded as completely settled and disposed of by one decision or order * * *." General Order No. 27, "Preamble" (May 25, 1918). At the Terminal today, blacks continue to experience the effects of pragmatic injustice; certainly this situation contravenes the avowed purpose of the Order and the Railway Labor Act. Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, *supra,* 323 U.S. at 213, 65 S.Ct. 235; Steele v. Louisville & Nashville R.R., *supra,* 323 U.S. at 199–204, 65 S.Ct. 226; *see* Conley v. Gibson, 1957, 355 U.S. 41, 42, 78 S.Ct. 99, 2 L.Ed.2d 80.

▆ That hoary collective bargaining agreements now mandate perpetuation of past aberrations from the governmental policy does not affect the propriety of judicial action. *See* Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra,* 407 F.2d at 1054. Such agreements do not, *per se,* carry the authoritative imprimatur and moral force of sacred scripture, or even of mundane legislation. "A contract may be fair and impartial on its face yet administered in such a way, with the active or tacit consent of the union, as to be flagrantly discriminatory against some members of the bargaining unit." Conley v. Gibson, *supra,* 355 U.S. at 46, 78 S.Ct. at 102. Under the Railway Labor Act, federal courts have had the power to protect employees against invidious discrimination. Conley v. Gibson, *supra* at 42, 78 S.Ct. 99; *see* Czosek v. O'Mara, 1970, 397 U.S. 25, 27–28, 90 S.Ct. 770, 25 L.Ed.2d 21; Glover v. St. Louis-San Francisco Ry., 1969, 393 U.S. 324, 328–329, 89 S.Ct. 548, 21 L.Ed.2d

---

32. Part IX *infra.*

519; Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 772–775, 72 S.Ct. 1022, 96 L.Ed. 1283; Richardson v. Texas & New Orleans R.R., 5 Cir. 1957, 242 F.2d 230, 234–236; Central of Georgia Ry. v. Jones, 5 Cir. 1956, 229 F.2d 648, cert. denied, 352 U.S. 848, 77 S.Ct. 32, 1 L.Ed.2d 59. Under the National Labor Relations Act, they have exercised an identical power. *See* Syres v. Oil Workers Local 23, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, rev'g, 5 Cir., 223 F.2d 739; Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers v. NLRB, 5 Cir. 1966, 368 F.2d 12, cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99; Evans v. Local 2127, International Brotherhood of Electrical Workers, N.D.Ga.1969, 313 F. Supp. 1354, 1358–1359. Supplementing these earlier enactments, Title VII has expanded the scope of judicial inquiry and augmented the power of remedial relief in cases involving discriminatory employment practices based upon race, color, religion, sex, or national origin. Norman v. Missouri Pacific R.R., 8 Cir. 1969, 414 F.2d 73, 83.

 When the current effects of past—and sometimes present—racial discrimination in entities subject to the National Labor Relations Act have come to our attention, this Court has unhesitatingly required affirmative remedial relief. *E. g.,* Local 189, United Papermakers & Paperworkers v. United States, *supra*; United States v. Hayes International Corp., *supra*; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra*; *see* Culpepper v. Reynolds Metals Co., 5 Cir. 1970, 421 F.2d 888, 891. *Compare* Taylor v. Armco Steel Corp., 5 Cir. 1970, 429 F.2d 498 (post-Act), *with* Whitfield v. United Steelworkers Local 2708, 5 Cir. 1959, 263 F. 2d 546, cert. denied, 360 U.S. 902, 79 S. Ct. 1285, 3 L.Ed.2d 1254 (pre-Act). As *Local 189* and *Vogler* demonstrate, such relief often proves detrimental to whites' competitive seniority status, and consequently to their transfer and promotion expectations.

Certainly the railroads and their support facilities present the courts with complex factual situations and difficult practical problems not often encountered in other industries. Nevertheless, the railroads' rules and agreements governing employment relations are no less susceptible to perverse interpretation and utilization than those found in other industries. Thus, in a Title VII legal context, the railroad world is not a "state within a state." Mr. Justice Harlan's *caveat* regarding analogies between this industry and any other must remain inapposite. *See* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344. In the instant case, neither the Terminal nor the Unions have justified immunity to remedial relief. It should be self-evident that our decision with respect to seniority rights and transfer and promotion restrictions applies only to their use at this single facility, not to the whole railroad world.

### VI.

The supervisor-devised personnel test currently in use in the Baggage and Mail Department has been a factor in both initial job assignment and transfer decisions since April 1967. New-hires and group 3 incumbents desiring group 1 positions have been permitted, and advised, to take the examination. "Validation" has been accomplished by correlating supervisors' estimations of each group 3 employee's group 1 job potential with his test scores. The examination's influence on individual job assignment and transfer decisions vacillates: test scores are criteria, but their value seems *ad hoc.* Allegedly no "passing" score is necessary, nor has one been determined. Indeed, the Terminal avers that taking the test is not prerequisite to attaining group 1 status. However, no group 3 black employees have reached group 1 since the test was developed. All persons holding group 1 jobs prior to April 1967 have been exempted from the examination.

On the basis of these facts, more fully developed *supra*, we conclude that the employer has not adequately borne the burden of showing that this examination has "a manifest relationship to the employment in question." Griggs v. Duke Power Co., *supra*, 401 U. S. at 432, 91 S.Ct. at 854; *accord*, Colbert v. H–K Corp., 5 Cir. 1971, 444 F.2d 1381 [1971]. The evidence does not sufficiently indicate "*a demonstrable* relationship" between the test and "successful performance of the jobs for which it was used." *Id.* at 431, 91 S.Ct. at 853. Accepting *arguendo* that whites scoring high on the test perform satisfactorily in group 1 positions, to conclude that therefore blacks scoring low could not adequately perform the same jobs is a *non sequitur*. In fact, any probability of correlation seems dubious in light of the experience of Roger Stamper, who achieved a relatively low score on the test but who has admittedly functioned satisfactorily as a group 1 employee. (As noted earlier, Stamper was a probationary group 1 Assistant Foreman when the test was developed.) *Griggs* demands more substantial proof, most often positive empirical evidence, of the relationship between test scores and job performance. *Id.* at 431, 91 S. Ct. 849. Certainly the safest validation method is that which conforms with the EEOC Guidelines "expressing the will of Congress." *See id.* at 434, 91 S.Ct. 849. *See generally* 29 C.F.R. §§ 1607.1–1607.9 (1971).

Clearly, even prior to *Griggs*, the Terminal could have properly assessed the value of its examinations. Evidence that it did so, however, is absent here; for test scores have been compared only with predicted, not actual, job performance of blacks. The Terminal did not even bother to use those persons holding group 1 positions at the time the test was devised as a control group, so that a demonstrable correlation—or lack thereof—between test scores and group 1 job performance could have been ascertained. Thus, although the Terminal's examination is assertedly and apparently "related" to qualifications for clerical positions, it is not demonstrably any more accurate a predictor of job performance in specific group 1 positions than the intelligence tests rejected in *Griggs*. The Supreme Court has summarized:

Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor. * * * What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract.

*Id.* at 436, 91 S.Ct. at 856. The Government cannot prove that the test used here is a controlling force, primarily because the Terminal has conceded that its overall influence remains nebulous. Nevertheless, since no group 3 black has attained group 1 status after April 1967, the inference that test scores are important factors in the selection of group 1 employees becomes conclusive. The test's use violates section 703(h) of the Act, 42 U.S.C.A. § 2000e–2(h). We hold that the District Court erred in upholding the validity of the personnel test and in refusing to enjoin its use, as well as in failing to order remedial action alleviating the present effects of its past influence.

Also fatal to the test utilized in this instance, and a problem to be avoided in the future, is the discriminatory exemption of group 1 employees, the great majority of whom are white, from taking the examination. Hicks v. Crown Zellerbach Corp., E.D.La.1970, 319 F.Supp. 314, 321; 42 U.S.C.A. § 2000e–2(h). If test scores and job performance are truly concomitant, those performing satis-

factorily in group 1 positions should have achieved the higher scores. There can be no rational justification for exempting these group 1 employees without granting identical immunity to their group 3 contemporaries. *See* Griggs v. Duke Power Co., 401 U.S. *supra* at 431, 91 S.Ct. 849.

Finally, finding no job-related objective criteria for specific group 1 jobs in the department, we conclude that the Terminal must ascertain and publicize such qualifications, which shall be applicable to all employees, group 1 incumbents as well as candidates. Griggs v. Duke Power Co., *supra*; Hicks v. Crown Zellerbach Corp., *supra*, 314 F.Supp. at 321.

### VII.

The Government's contentions with regard to the post-Act segregation of locals represented by the BMWE and BRAC and the UTU local's failure to recruit blacks for membership require only limited discussion. If the BMWE and the BRAC locals are not segregated in principle, they certainly are in fact. Conceding that recent good faith efforts by Union members have resulted in token integration of the formerly all-white and all-black locals, there appears no valid justification for preservation of these locals as separate entities. The record clearly discloses that the existence of "separate but equal" locals has had, and may continue to have, post-Act deleterious effects on blacks.

The BMWE Seaboard Federation represents all employees in collective bargaining with the Terminal. Terminal delegates to the Federation convention, where union policy presumably is debated and determined, have always come from the all-white local but have cast one vote for each member of both locals. These delegates have been elected exclusively by members of the white local. Thus we must conclude, and the Union has not disproved, that black BMWE members at the Terminal have had no voice in their bargaining agent's coun-

cils. Here, at least, black influence in Federation affairs remains nonexistent.

With regard to the BRAC, the rationale for separate locals is based on the fact that group 1 employees are members of one local, while group 3 employees are members of the other. However, the same bargaining agent represents both locals in negotiations with the Terminal. Until March 1969, when the Terminal began posting notices of all job openings on all bulletin boards and in all bulletin books at the facility, notices concerning group 1 openings have reached only incumbent group 1 employees. Although a great majority of BRAC members at the Terminal have been black, a black was not elected District Chairman until January 1970, long after the Government initiated this suit.

Contrary to the allegations made by the Unions, we find that their locals are not mere "social clubs," having no influence in national union policy or practice. We conclude that the District Court erred in refusing to hold that the failure to consolidate the locals violates section 703(c) of the Act, 42 U. S.C.A. § 2000e–2(c). *See* United States v. Sheet Metal Workers Local 36, *supra*, 416 F.2d at 127–129; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra*, 407 F.2d at 1051–1055; United States v. International Longshoremen's Association, D.Md.1970, 319 F.Supp. 737, 741–742; Hicks v. Crown Zellerbach Corp., E.D.La.1970, 310 F.Supp. 536; United States v. Local 189, United Papermakers & Paperworkers, E.D.La. 1969, 301 F.Supp. 906, 919, aff'd, 5 Cir., 416 F.2d 980.

The UTU's justification for failing to recruit blacks which it represents at the bargaining table is chimerical. While the Union's current effort to extend membership to blacks is commendable, its failure to recruit Nesmith remains unexplained. Moreover, the total absence of black members in the local for at least four years after the Act's effective date clearly indicates a perpet-

uation, whether or not specifically intended, of pre-Act discriminatory practices and policies. The Union's recent burst of recruiting activity does not preclude judicial intervention. Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra,* 407 F.2d at 1055; *see* United States v. Electrical Workers Local 38, *supra,* 428 F.2d at 151; United States v. Sheet Metal Workers Local 36, *supra; cf.* United States v. W. T. Grant Co., 1953, 345 U.S. 629, 632–633, 73 S. Ct. 894, 97 L.Ed. 1303.

## VIII.

The parties can easily resolve the disagreement *sub judice* concerning possible segregation of toilet, shower, and locker facilities. Certainly the Terminal can notify workers of the fact that its toilet facilities are available to all who have a need. Reasonable nonracial rules restricting use of such facilities to the vicinity of the employee's work area can be formulated. The segregated shower and locker problem seems a vestige of pervasive discrimination in the crafts and classes of employment. Here, too, the Terminal can easily assure integrated facilities. *See* United States v. Medical Society of South Carolina, D.S.C. 1969, 298 F.Supp. 145, 156.

## IX.

■ In light of our conclusions, it becomes clear that remedial action is essential to effectuate the aims of Title VII in the case *sub judice.* Under the District Court's careful supervision, the parties should work together in developing effective antidotes for the racial discrimination which we perceive at the Terminal. The District Court bears the ultimate responsibility for fashioning

such relief: it is not limited to simply parroting the Act's prohibitions but is required to order such affirmative action as may be appropriate. Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, *supra,* 407 F.2d at 1051–1052; *accord,* United States v. Sheet Metal Workers Local 36, *supra,* 416 F.2d at 132 & n. 18; *see* United States v. Dillon Supply Co. *supra,* 429 F.2d at 804; United States v. Hayes International Corp., *supra,* 415 F.2d at 1044–1045; 42 U.S.C.A. § 2000e–5(g). The specific modifications shall conform to the following guidelines:

1. Before filling any vacancy,[33] the Terminal shall follow the procedure hereafter set forth. It shall award the job in accordance with the District Court's decree, unless no incumbent Terminal employee bids for the position.

A. The Terminal shall continue to post notices of all job openings or vacancies in any contract job in any department on all bulletin boards and in all bulletin books maintained for employees.

B. Each notice of a job opening or vacancy shall set forth a brief description of the job, its rate of pay, the minimum requirements for the position, a notation of any other terminal job prerequisite to the vacant position, and a statement of the nature and extent of any training which will be provided to the successful bidder.

C. Vacancies in any job shall be filled in the following manner:

I. All members of the affected group [34] shall be entitled to bid on any job outside their craft or class. They may use their Terminal seniority dates [35] for bidding purposes, until they successfully bid for, and retain

---

33. "Churning" or "reshuffling" of jobs within a certain craft or class obviously does not produce a "vacancy." As the Government has agreed, the term must be considered in a realistic context.

34. The "affected group" shall be comprised of all black Terminal employees hired prior to the effective date of the District

Court's decree pursuant to the mandate of this Court.

35. The "Terminal seniority date" for each employee shall be the earliest seniority date assigned to that employee on any of the Terminal's seniority rosters in effect at the time of the District Court's decree pursuant to the mandate of this Court.

after any on-the-job probationary or training period (if required), positions outside the craft or class which they occupy at the time of the District Court's decree. Thus a member of the affected group will normally use his Terminal seniority date only once to gain a position in another craft or class. When applicable collective bargaining agreements or Terminal policy permit the use of craft or class seniority to bid for vacant jobs outside the craft or class, members of the affected group shall utilize Terminal seniority in lieu thereof. To bid on positions within any craft or class which he occupies at the time of or subsequent to the District Court's decree, a member of the affected group may always use his Terminal seniority date. *See* (1) (D) *infra.*

II. All *non*members of the affected group currently holding seniority on the roster where the job vacancy exists shall be entitled to bid on the vacant job in accordance with the terms of the applicable collective bargaining agreement.

III. Commensurate with the foregoing, the job will then be awarded to the qualified employee with the earliest Terminal seniority date of those eligible to bid.

IV. The Terminal shall determine qualifications and evaluate bidders. If the Terminal finds that the senior bidder does not possess sufficient fitness and ability to adequately perform the job, it may refuse to award him the position or disqualify him at any time during the on-the-job probationary or training period in accordance with the terms of the applicable collective bargaining agreement. When the Terminal decides that a member of the affected group is unqualified to hold a job for which he was the senior bidder, it must inform him in writing: such writing shall detail the employer's reasons for the rejection. The Attorney General shall receive copies of this notice upon request.

V. If the applicant provisionally selected to fill the vacancy in accordance with the above procedure does not possess sufficient fitness and ability to adequately perform the job, he may be disqualified and returned to his old position or placed in another job. Utilizing the above procedure, the Terminal may then select another individual to fill the vacancy. Any applicant found unqualified and returned to his old craft or class shall re-establish his original seniority date in his old job and craft or class. Any applicant found unqualified and placed in another craft or class shall utilize his Terminal seniority date in that job and craft or class.

VI. If the Attorney General has reasonable cause to believe that an employer transfer or promotion decision has been based on qualification criteria proscribed under Title VII, he —or his designated representative— may file an appropriate complaint in the District Court.

D. Whenever a member of the affected group bids for and is awarded a job in accordance with the procedure delineated in sub-part C *supra*, he shall establish as a seniority date in his new job or on his new seniority roster the oldest seniority date which he holds on any of the Terminal's seniority rosters in effect at the time of the District Court's decree. The date thus set shall be the only date used in determining the employee's right to promotion, demotion, layoff, furlough, or any other right affected by seniority in his new craft or class, as set forth in the collective bargaining agreement covering workers in that craft or class.

E. If the vacant job is a job for which there is some other necessarily prerequisite job at the Terminal or in the railroad industry, the category of persons eligible to bid shall be limited to those persons who have held the prerequisite position for enough time to qualify for the vacancy.

F. If the vacant job is a job which has been held by persons for enough time to qualify, and no other person can manifest equivalent qualifications, the category of persons eligible to bid shall be limited to those qualified individuals.

G. If no member of the affected group bids for a vacant job, that position shall be filled in accordance with the applicable collective bargaining agreement or by utilization of the Terminal's "best qualified" standard.

2. The Terminal shall discontinue use of its Baggage and Mail department personnel test as a factor in determining the qualifications of any current or prospective employee to hold group 1 positions until the examination has been properly validated. The Terminal shall not reinstitute the test or require any other test for members of the affected group hired prior to the District Court's decree, unless white employees hired prior to the decree are also required to pass the same test, properly validated, to retain group 1 positions.

The Terminal shall ascertain and publicize job-related, objective qualification criteria for each group 1 position.

3. Every member of the affected group who is working in any job at the time the District Court's decree is entered pursuant to this Court's mandate shall be allowed to remain in such job and transfer his Terminal seniority date to that job or the pertinent seniority roster.

4. The District Court shall order consolidation of the BRAC and BMWE locals. The court shall prescribe a reasonable consolidation procedure and provide for the equitable representation of all Union members during and after any necessary transition period.

5. The UTU shall invite any black Yardmen working for the Terminal at the time of, and subsequent to, the District Court's decree to become members.

6. The Terminal shall take reasonable steps to ensure the complete desegregation of its toilet, locker, and shower facilities. It shall immediately notify all employees that these facilities may be utilized without regard to race or color.

7. The District Court's final decree shall be posted in prominent places on Terminal property. The Terminal shall ensure that its provisions are explained to all employees.

8. The District Court shall impose record-keeping requirements sufficient to assess compliance with Title VII by the Terminal and the Unions.

9. The District Court shall provide that the Attorney General's, or his designated representative's, costs and disbursements in the aktion *sub judice* shall be taxed jointly and severally to the defendants.

Affirmed in part, reversed in part, and remanded with directions.

COLEMAN, Circuit Judge (dissenting).

With all deference for the prodigious labor and the prolonged consideration which went into the production of the majority opinion, I respectfully dissent.

Of course, I do not disagree with all that is said in the opinion. Yet, I see nothing worthwhile to be achieved by further lengthening matters by a prolonged catalog of my agreements and disagreements.

Realizing that the opinion of the Court must ultimately stand or fall on its own merits, I shall touch only upon the "high spots" of my views.

1. The majority, for whom I have the most profound personal and professional respect, has examined every chip in the woodyard for the purpose of demonstrating that the trial findings of fact are clearly erroneous. With deference, it seems to me that the effort results in the substitution of appellate findings for those of the only man with the authority to make them, i. e., the District Judge. I think the findings below are supported by substantial evidence. I definitely do not have the conviction that they are manifestly wrong. Hence, I would not interfere with them.

2. If, however, there are wrongs which are to be corrected, then I am very sorry that this Court, an appellate Court, attempts to assume the function of formulating the remedy by a "model decree". The remedy should come in the District Court after full and complete hearings, based upon our exposition of the law, in which all hands would have an opportunity to point up advantages or deficiencies affecting the wisdom of the action proposed to be taken. I do not discount the possibility that the parties might, out of their peculiar expert knowledge of the subject, hammer out a consent decree that would be far more effective than that devised by us, far removed, as we are, from the sound of the whistle and the roar of the diesel.

I shudder to consider that by this decision the Fifth Circuit now undertakes to oversee the operation of railroads, railroad terminals, labor unions, and the handling of the United States Mail. That is what is involved in hiring and promoting those who are to do the actual work.

3. I feel that this case should be decided in its true context, which is that we are here concerned with a railroad terminal with a long history of union labor contracts, standardized throughout the Nation. Those contracts cannot be *unwritten* as to days long gone past. If God cannot change yesterday then we judges can hardly be expected to do it. The majority holds, as I understand it, that there has been no racial discrimination in hiring since the effective date of the Act. The discrimination, they say, is in promotions. Are we going to eliminate that discrimination by destroying the *seniority* of those who for years, under contract, in good faith worked to earn it? That, to me, is substituting one form of discrimination for another.

4. Assuming that remedial action is needed, I think we should accomplish it by directing the District Judge to enter appropriate injunctive orders after a full hearing and upon mature consideration.

I respectfully dissent.

ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

PER CURIAM:

The Petitions for Rehearing are denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc are denied.